**UNITED STATES of America,
Plaintiff,**

v.

**Billy Mac FISHER, Defendant.**

**No. 01–80039.**

United States District Court,
E.D. Michigan,
Southern Division.

May 15, 2001.

---

Daniel M. Hurley, Sheldon N. Light, Asst. U.S. Atty., Detroit, MI, for Plaintiff.

Penny Beardslee(Argued), Tracy Weaver(Brief), Federal Defender Office, Detroit, MI, for Defendant.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

On March 9, 2001, the Defendant, Billy Mac Fisher, filed a motion in which he asked the Court to suppress any evidence relating to the possession of a firearm that has been attributed to him because, in his opinion, the weapon was seized pursuant to an unconstitutional search. The Plaintiff, United States of America ("Government"), has vigorously opposed the request, contending that the search was in complete accord with the United States Constitution and applicable case law. For the reasons that are set forth below, as well as the rationale that was presented on the record during a hearing,[1] Fisher's motion will be granted. Moreover, this Order shall supercede any and all prior Orders pertaining to the motion.

I

After reviewing the pleadings and receiving the documentary and testimonial evidence that was presented in the hearing, the Court concludes that the following facts have been established in this record:

Just before midnight on December 15, 2000, the Inkster, Michigan Police Department ("Department") received an emergency cellular telephone call through the Michigan State Police. The call, which was characterized by the Department as a distress signal, originated from a male who reported that a woman had been abducted and was being forced into room seven of the Mona Lisa Motel at 28725 Michigan Avenue in Inkster, Michigan. The caller, after some hesitation and prompting by

---

1. An evidentiary hearing on Fisher's motion was conducted on April 25, 2001.

the Department representative, spoke in an unexcited monotone and only identified himself as "Mr. Johnson." Upon further questioning, he indicated that the abductee was a black woman whose name was "Cathy." He neither proffered his first name nor the woman's surname. With a notable lack of enthusiasm in the tone of his voice, "Mr. Johnson" urged the Department to "hurry up." The call ended with his promise that he would wait for the officers in front of the Motel and wear all black attire.

The Department's enhanced emergency telephone system, which was operational on December 15th, did not provide its officers with an opportunity to corroborate the veracity of the call. Sergeant Gregory Hill testified during the evidentiary hearing that his Department has the ability to promptly identify the specific place of origin of most telephone calls, from which the name, address, and telephone number of the caller are deduced or verified. However, unlike other types of calls, cellular telephone communications are (1) received by the Department through the Michigan State Police, and (2) not subject to the same tracing and informational process. In this case, the full name, address, and telephone number of the alleged informant were never identified.

In reliance upon the call, the Department dispatched officers in Police Units 156 and 157 to the Motel and communicated the content of the caller's message to them.[2] Officer Robert Karls, who was riding alone in Unit 156, was the first to

reach the Motel, having arrived at the site approximately four minutes after the Department issued the dispatch order. Within minutes, Officers Lashawn Orlando Smithon and Sean Adams arrived in Unit 157. The three officers scanned the Motel parking lot and approached room seven without seeing anyone in the immediate vicinity (including "Mr. Johnson") or hearing any unusual noises that would suggest some form of criminal activity.

Nevertheless, one of the officers—it is unclear which one—knocked on the door and loudly announced the presence of the police. After some delay, which lasted less than one minute, a man came to the door in the presence of another male occupant in the room. These men were subsequently identified as Andrew Thomas and Michael Hister. When the door was opened, neither Karls nor his fellow officers, whose weapons had been drawn, advised Thomas or Hister as to the purpose of their visit.[3] The two men were ordered out of the room, handcuffed, and asked if there was anyone else in the room. They answered in the negative.

From the doorway, Karls had a view of the entire motel room, with the exception of the bathroom. From that vantage point, he did not see any woman, firearm, or other evidence of unusual activity in the room or hear any unusual noises. Nonetheless, Karls went straight to the bathroom with his weapon drawn, turned the doorknob, and opened the door without knocking or seeking the consent of anyone,

---

**2.** The police officers were acting on the basis of the tip from "Mr. Johnson" and did not possess a warrant to conduct any search or arrest.

**3.** Officer Smithon offered a different version of the initial entry. He states that the alleged emergency situation was explained to Hister and Thomas, who voluntarily stepped outside.

Although the credibility of both officers in this particular case was questionable on a variety of grounds, the Court finds that, in light of the totality of the evidence, Karls' recollection on this point is a more accurate version. Notably, Smithon's memory of other material facts was unreliable.

including Hister or Thomas.[4] Upon opening the door, Karls found Fisher sitting on the toilet with his pants down. Fisher, after being ordered to raise his hands, was physically escorted out of the bathroom with his pants around his knees and handcuffed.

Karls reentered the bathroom, looked in the trash can, and found the contested firearm, a Walther PK .380 caliber handgun. The officers seized the weapon and arrested Fisher on state law charges of being a felon in possession of a firearm. Although no other criminal charges were brought against any of the men, all three of them were transported to the police station. Following a forensic examination, no fingerprints were found on the weapon. Although Fisher was bound over for trial in the state courts, the charges were later dismissed. Thereafter, the Government filed this federal lawsuit, charging Fisher with one count of being a felon who possessed a firearm in violation of 18 U.S.C. § 922(g).

## II

The Fourth Amendment to the Constitution protects the citizenry from being required to endure unreasonable searches or seizures of their persons or property. U.S. Const. Amend. IV. In constitutional jurisprudence, it is well settled that "searches and seizures inside a home are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Moreover, the Supreme Court has remarked that "[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office." *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (citing *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951)). Thus, according to the Court, "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures ." *Stoner v. State of Calif.*, 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (citations omitted).

■■■ The standards that pertain to the instant case have been clearly established. "[T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure ...." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A search that is executed pursuant to a warrant usually will be reasonable. Although the warrant requirement can be relaxed when exigent circumstances are presented, *id.*, "[t]he burden of justifying a warrantless entry into a private home or motel room is, of course, upon the Government." *United States v. Killebrew*, 560 F.2d 729, 733 (6th Cir.1977). If the Government is unable to meet its burden, "the general remedy for a Fourth Amendment violation is that the evidence obtained due to the unconstitutional search or seizure is inadmissible, including both evidence obtained

4. The Government has argued that Karls legitimately expected the bathroom to be empty since Thomas and Hister had advised him that no one else was present in the room. However, this argument runs counter to the ostensible purpose of the search. The police officers had been summoned to the Motel because of the reported abduction of a woman. Karls opened the bathroom door with the specific aim of looking for someone, possibly the abducted woman. That the officer did so with his weapon drawn is an indication that he also was prepared to see someone else, perhaps someone dangerous who might be lying in wait. The questions of if he had probable cause to rely upon the alleged emergency or whether he had any other legitimate reason to open the door, are discussed above. At this point, it is sufficient to observe that Karls likely had a significant expectation that someone would be in the bathroom.

as a direct result of the unconstitutional search and seizure and evidence that is considered fruit of the poisonous tree." *United States v. Murphy,* 241 F.3d 447, 457 (6th Cir.2001) (citing *United States v. Dice,* 200 F.3d 978, 983 (6th Cir.2000)).

In the case at bar, the Court has been asked to determine, among other things, whether the arresting officers had probable cause to conduct the search in question. Under the Constitution, all searches of premises must be supported by probable cause regardless of whether a warrant is obtained or an exception to the warrant requirement applies. *See Arizona v. Hicks,* 480 U.S. 321, 327, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *United States v. Johnson,* 9 F.3d 506, 509 (6th Cir.1993) ("Exigent circumstances justify a warrantless entry into a residence only where there is also probable cause to enter the residence."). In cases such as this one, where the Government relies upon the alleged presence of exigent or criminally suspicious circumstances, "[t]he establishment of probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Ogbuh,* 982 F.2d 1000, 1002 (6th Cir.1993). When applying these standards in its evaluation of Fisher's motion, the Court must look to the totality of the circumstances. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Fortunately, the case law contains decisive guidance on a closely related issue. In *Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Supreme Court addressed the circumstances under which a tip by an anonymous informant can be sufficiently reliable to warrant the Government's reliance upon it in intruding into a citizen's personal privacy. There, the police had received an anonymous report that a certain man was (1) wearing particular clothing, (2) located at an identified bus stop, and (3) seen to have possessed a concealed firearm. *Id.* at 268, 120 S.Ct. 1375. Officers responded to the call, found and frisked a man who fit the description, and confirmed that he illegally possessed a firearm. *Id.* Following a charge under state law for the improper possession of the weapon, the trial court suppressed the evidence on the ground that the officers lacked any reasonable suspicion to conduct the stop and frisk, and the prosecutor filed an appeal. *Id.* at 269, 120 S.Ct. 1375.

In affirming that the tip lacked adequate credibility to satisfy the Fourth Amendment, the *J.L.* Court first identified the dangers that are inherent in any information which is obtained through an anonymous source:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams,* 407 U.S. 143, 146—147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White,* 496 U.S. [325,] 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 [ (1990) ].

529 U.S. at 270, 120 S.Ct. 1375. At the same time, the Court recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Id.* (quoting *White,* 496 U.S. at 327, 110 S.Ct. 2412). Thus, the question presented to the Court was "whether the tip pointing to [the defendant] had those indicia of reliability." *Id.*

Given the facts in *J.L.* and its particular relevance to the instant case, a lengthy quotation of the Court's rationale is warranted. It reasoned:

The anonymous call concerning [the defendant] provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [the defendant] of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]. * * *

[The government] contends that the tip was reliable because its description of the suspect's visible attributes proved accurate: There really was a young black male wearing a plaid shirt at the bus stop. The United States as amicus curiae makes a similar argument, proposing that a stop and frisk should be permitted "when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip . . . ." These contentions misapprehend the reliability needed for a tip to justify a *Terry* stop.

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.* at 271—72, 120 S.Ct. 1375 (numerous citations omitted).

█ After a careful review of the record in the present case, the Court concludes that the emergency call at issue was even less reliable than the tip in *J.L.* As a preliminary matter, this Court finds that the cellular telephone call at issue was, for all practical purposes, anonymous. It could not be traced to the informant, and its content was questionable. The police dispatcher heard the unenthusiastic voice of a man, who was identifiable only as "Mr. Johnson," dispassionately report that a woman was being dragged into a hotel room. The tone of his voice alone should have been a cause for some doubt on the part of the Department. Moreover, in *J.L.*, where reasonable suspicion was lacking, the police arrived to find a person who matched the identified physical description, clothing, place, and time. By contrast here, the caller promised to wait in front of the Motel for the officers to arrive. When the police came, he was nowhere to be found, and no one heard any screaming or unusual noises. The officers discovered nothing to corroborate the tip, and there was nothing unusual about the ground or courtyard outside Fisher's motel room that would suggest any criminal conduct or activity. Moreover, even after the door to Fisher's room was opened by Karls, there was no evidence that a woman had been present. These facts compel a finding that the anonymous tip in this case did not even create the inadequate degree of suspicion that may have existed in *J.L.*

█ Under these circumstances, it would appear that the evidence does not even create a reasonable suspicion to conduct a "stop and frisk" pursuant to *Terry*,

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Moreover, it is well settled that the standards for probable cause are higher and stricter than those for a finding of a reasonable suspicion. *See Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (" '[R]easonable suspicion' is a less demanding standard than probable cause ...."); *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause ...."); *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("The 'reasonable suspicion' standard ... effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause."); *Almeida–Sanchez v. United States,* 413 U.S. 266, 268, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1976) ("[T]here was no probable cause of any kind for the stop or the subsequent search—not even the 'reasonable suspicion' found sufficient for a street detention and weapons search in *Terry v. Ohio.*"). Thus, the Court determines that the Government has not met its burden to prove that the informant's tip at issue (1) had sufficient indicia of veracity and (2) supported a finding of a probability or a substantial chance of criminal activity.

■ In addition, the Government has not met its burden to prove that an alternative justification existed for entering the hotel room. Karls admits that, while his weapon was drawn, he ordered Hister and Thomas to exit the room without any explanation. Smithon, through his demeanor while on the witness stand during the evidentiary hearing, was not a sufficiently credible witness to allow much reliance on his testimony that Hister and Thomas, both of whom having been advised of the potential criminal situation, were peace-

ably asked to step outside of their room. Accordingly, the Court concludes that voluntary consent to support the entry did not exist. As such, the officers did not have a constitutional basis upon which to admit themselves into Fisher's Room. Hence, the search must be, and is, deemed to be in violation of the Fourth Amendment to the Constitution.

■ The Government has also argued that this search must be upheld because police officers have a duty to investigate reports of criminal activities. The Court agrees with the Government's basic premise. However, its contention is overstated. When police officers receive a credible report that an emergency situation is in progress, they have a legal responsibility to respond. Thus, if the call from "Mr. Johnson" had been credible and if probable cause had existed to believe that exigent circumstances were present, the tip may have justified a preliminary search of the hotel room and permitted a non-consensual opening of the bathroom door.

■ Nevertheless, the call would not have justified the extended search by Karls of the bathroom, and the firearm would not be admissible. Even when an emergency legitimates a warrantless entry, any subsequent search of the premises must be " 'strictly circumscribed by the exigencies which justif[ied] its initiation.' " *Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Terry v. Ohio,* 392 U.S. 1, 25—26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Under the Constitution, an initial emergency will not justify (1) a search that is conducted after the exigency has subsided, *see Mincey,* 437 U.S. at 393, 98 S.Ct. 2408; *United States v. Johnson,* 22 F.3d 674, 679—680 (6th Cir.1994) (upon responding to call that woman was being held against her will in apartment, the police were not justified in searching the apartment after the woman

was freed), or (2) a search of an area that is more intrusive than is necessary to address the immediate danger, *see United States v. Pierson,* 219 F.3d 803 (8th Cir. 2000) (warrantless entry of hotel room on basis of exigency did not justify search of garment bag therein). The evidence in the present case supports a finding that, once the bathroom door was open and it became apparent to the investigating officer that there was no woman in danger, the initial exigency evaporated. Thus, under these circumstances, the Government must set forth a different ground for the seizure of the weapon.

In its pleadings, the Government contends that the search was necessary in order to protect the officers against some possible act of physical violence. Under federal law,

> [a] 'protective sweep' is a quick and limited search of premises, incident to an arrest, conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.... Beyond that, however, ... there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), *quoted in United States v. Biggs,* 70 F.3d 913, 915 (6th Cir.1995).

 According to the Government, Fisher was a known felon, and the police had good reason to believe that he might present a danger to them. However, this argument is flawed, in that the challenged search was conducted after Fisher had been involuntarily removed from the bathroom. At the time of the search, no one had been arrested on any purported federal or state criminal charge even though everyone was in handcuffs. Indeed, no charges were ever brought against Hister and Thomas in relation to the incident. Thus, the search did not follow a lawful arrest. Instead, it precipitated the arrest in question. Moreover, it was immediately apparent that no one was hiding in the bathroom. Thus, the Government has a heavy burden to articulate further facts as to why a protective sweep would be appropriate. Each man was within the control of the arresting officers, and Fisher was outside the bathroom with his pants around his knees or ankles. On these facts and without more, the Court finds that the officers' protective interests did not justify their search of the bathroom.

 The Government also maintains that when Karls reentered the bathroom, the firearm was in plain view and thus it was subject to a seizure. "The plain view doctrine allows a warrantless seizure of items if: (1) the officer is lawfully on the premises; (2) the discovery is inadvertent; and (3) the incriminating nature of the items is immediately apparent." *Brindley v. Best,* 192 F.3d 525, 534 (6th Cir.1999) (citing *United States v. Blakeney,* 942 F.2d 1001, 1028 (6th Cir.1991)).

In the present case, the record does not contain any credible evidence that would suggest that Karls saw the weapon when he first opened the bathroom door and saw Fisher. Instead, he found it only after his reentry into the bathroom. However, for the reasons that have been set forth above, the Court does not find any basis under the law upon which he was authorized to make a reentry. Finally, there is no evidence that he stood legitimately outside the bathroom and still was able to see the gun. In such case, the plain view doctrine will not justify the search and seizure.

Thus, the evidence is subject to a suppression.

## III

In summary, the evidence of the firearm in this case will be suppressed because the police officers lacked probable cause to enter Fisher's hotel room. Moreover and for the reasons that have been set forth above, the circumstances would not support the search here even if such a cause had existed. Accordingly, Fisher's motion is granted.

IT IS SO ORDERED.