UNITED STATES of America,

v.

Donnell Sean WIGGINS, Defendant.

No. 2:01CR229.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 28, 2002.

James A. Metcalfe, Asst. U.S. Atty., Norfolk, VA, for USA.

J. Barry McCracken, Norfolk, VA, for Defendant.

## OPINION

REBECCA BEACH SMITH, District Judge.

Defendant Donnell Sean Wiggins filed a motion to suppress evidence seized subsequent to a warrantless entry into his residence by three Norfolk City Police Officers. Defendant argues that the war-

rantless entry violated the Fourth Amendment, thereby making the evidence seized by the officers "fruit of the poisonous tree" which must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). For the reasons set forth below, the court finds that the officers' entry into defendant's residence did not violate his Fourth Amendment rights. Accordingly, defendant's motion to suppress is DENIED.

## I. Findings of Fact[1]

On the evening of August 8, 2001, Norfolk Police Officers G. Wall, T. Sterling, and E. Palevich were dispatched to 3227 Flanders Avenue in Norfolk, Virginia, to respond to a report that an individual had been shot in the hand, had run into that building, and that someone was trying to bandage the victim's hand.[2] The report was based on an anonymous 911 call made from a payphone located at Ocean Delight Seafood on Ballantine Boulevard; this location is less than two-tenths of a mile from the defendant's residence. The building at 3227 Flanders is a two-story duplex divided into two apartments, designated "A" and "B." Defendant resided in Apartment B.

The officers responding to the 911 call knew that the neighborhood surrounding 3227 Flanders Avenue is a high crime area. Indeed, Officer Wall had previously been to Apartment A to respond to reports of narcotics activity. When the officers arrived at 3227 Flanders, they knocked on the door to Apartment A and received no response. They noticed that Apartment A was dark and that the electrical meter for that apartment had been turned off. It is unclear whether Apartment A was marked as such; Apartment B had no designation marking it as such.

After concluding that no one resided in Apartment A, the officers focused on what was identified to be Apartment B. They noticed a surveillance camera located above the door to that apartment. Based on the officers' experience, such cameras are often involved with criminal activity, and the camera posed a significant risk to their safety. For this reason, the officers disconnected the surveillance camera. Subsequent to disconnecting the camera, the officers knocked on the door to defendant's apartment. After several minutes the defendant answered his door. At the point when defendant answered his door, at least one officer, G. Wall, had his weapon drawn.

The officers explained to the defendant that they were responding to a report of a shooting and that they wanted to quickly search his apartment for a victim. The defendant asked several times why the officers wanted to enter his apartment and each time the officers indicated they were there in response to a report of a shooting.

---

1. The court bases its findings of fact largely on the evidence proffered in the hearings held on January 30, 2002, and February 12, 2002. Three witnesses testified in the hearings: Officer T. Sterling, Officer G. Wall, and Vice and Narcotics Investigator N.J. Reardon. The court finds each of these officers to be credible witnesses.

2. There appears to be some confusion as to what information was relayed to the officers prior to their arriving at the defendant's apartment building. Some of the officers testified that they had received a report that someone had been shot in the hand and had subsequently run into the building located at 3227 Flanders Avenue. A review of the radio dispatch indicates that the officers received a report that someone within that building had been shot in the hand. *See infra* at 10. Obviously this case involved a tense situation, and for the purposes of this opinion, the court finds that the officers were responding to a call that someone either within or near the building had been shot in the hand.

During the course of this conversation, the officers noticed that defendant was sweating profusely and appeared to be nervous; the defendant's agitation added to Officer Sterling's suspicions regarding the 911 shooting call. At some point during the conversation, the officers stepped into the front hallway of defendant's residence, and Officer Sterling informed the defendant that the officers were going to do a quick sweep of the apartment to verify that there was no shooting victim inside. When the defendant protested that they did not need to search his apartment, Officer Sterling pushed his way past the defendant and entered the apartment. Defendant did not consent to the officers' entry into his residence.[3]

During the sweep of defendant's apartment, the officers did not find either a gunshot victim or someone in possession of a gun. However, while in an upstairs bedroom of the apartment, Officer Sterling observed in plain view a corner of a sandwich bag that contained a white powder residue; the corner was located on top of a dresser in an upstairs bedroom. Officer Sterling believed the residue to be cocaine. Based on his observation, he went downstairs and informed defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At

that point, defendant was under arrest and was not free to depart from the residence. Defendant declined to make any statement subsequent to receiving his *Miranda* rights.

Around the same time that Officer Sterling provided the defendant with his *Miranda* rights, he called Vice and Narcotics Investigator M.J. Reardon to inform him of the suspected drug activity in the apartment. Investigator Reardon, accompanied by Corporal Stevens, proceeded to the apartment. Upon arriving, Investigator Reardon spoke with the defendant in an attempt to obtain consent to search the apartment. The defendant was seated on his living room couch and Investigator Reardon sat on a coffee table to speak with him. In plain view on the coffee table were stems and seeds that appeared to Investigator Reardon to be marijuana.

At this point, defendant consented to the search of his apartment but refused to sign a written form consenting to the search.[4] Subsequent to defendant's consent, Investigator Reardon, accompanied by the defendant, went upstairs to conduct a search. In an upstairs bedroom, Reardon observed cut-off corners of sandwich bags with a powdery residue inside of them. Another officer approached Reardon during the

---

**3.** The government's initial position was that the officers obtained consent to enter the defendant's residence. However, Officer Sterling candidly testified that the officers did not seek the defendant's consent prior to entering and initially searching the apartment for the reported shooting victim.

**4.** The defendant's consent to a search of his residence is a question of fact to be determined by the court in light of the totality of the circumstances. *See United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the

conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Id.* That defendant refused to sign a waiver does not preclude a finding of consent. *Id.* at 651 (citing *United States v. Thompson*, 876 F.2d 1381, 1384 (8th Cir.1989)). At the time defendant gave his consent, only Investigator Reardon was speaking with him, and the court finds that Investigator Reardon engaged in a non-coercive encounter with the defendant. Given the nature of the encounter, and the defendant's maturity and intelligence as evidenced in his interactions with the court, the court finds that his consent was voluntary.

search and informed him that officers had observed a digital scale inside an open box and an open "Sentry safe" with ammunition inside. Each of these items were in plain view to the officers. Defendant became agitated and irrational, and Reardon immediately halted the search of defendant's apartment. Based on the evidence found in the defendant's apartment during the consented-to search, Reardon applied for a search warrant. A state magistrate found probable cause and issued a warrant to search the apartment. Pursuant to the warrant, officers returned to the defendant's residence and seized the following items: an Uzi sub-machine gun; a sawed-off shotgun; a 9mm semi-automatic pistol; unspent ammunition (9mm, 20 gauge shotgun, and .380 caliber shells); plastic bag corners with narcotic residue; unused plastic bags; a plumb scale; a VX2000 scale; a Sentry safe; a safety monitor; and assorted paperwork.

## II. Discussion

■ The Fourth Amendment provides that the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court has recognized that under the Fourth Amendment, an individual's expectation of privacy in his home is particularly great. *Payton v. New York*, 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms...."); *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil

against which the wording of the Fourth Amendment is directed."). It is because of this heightened privacy interest that a warrantless entry into an individual's home is *per se* unreasonable, unless the intrusion falls within one of the carefully defined exceptions to the warrant requirement. *Payton*, 445 U.S. at 586–89, 100 S.Ct. 1371.

■ One exception to the warrant requirement is the existence of exigent circumstances. Exigent circumstances exist where "law enforcement officers confront a 'compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant.'" *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir.1995) (citations omitted); *see also United States v. Campbell*, 945 F.2d 713, 715 (4th Cir.1991) ("Exigent circumstances ... means that there is insufficient time to obtain a warrant."). An important limitation to the doctrine of exigent circumstances is that "[these] circumstances justify a warrantless entry into a residence only when there is also probable cause to enter the residence." *United States v. Johnson*, 9 F.3d 506, 509 (6th Cir.1993); *see also United States v. Jones*, 239 F.3d 716, 719 & n. 2 (5th Cir.2001); *United States v. Burgos*, 720 F.2d 1520, 1525 (11th Cir.1983); *United States v. Turner*, 650 F.2d 526, 528 (4th Cir.1981). To justify the officers' warrantless entry into the defendant's residence, the government relies upon the existence of probable cause and exigent circumstances. Accordingly, the court will address each of these requirements in turn.

### Probable Cause

■ Probable cause to search exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see also Johnson*, 9 F.3d at 509 ("The establishment of prob-

able cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity' ") (citation omitted). In evaluating whether probable cause existed, the court is required to consider the "totality of the circumstances" surrounding the officers' warrantless entry into the defendant's residence. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

Defendant claims that when the officers effectuated a warrantless entry into his residence, they did so based on an uncorroborated anonymous tip. He contends that an anonymous tip is insufficient to support a finding of probable cause, and, therefore, the officers' warrantless entry violated his Fourth Amendment rights. (Def.'s Mot. Suppress at 8.) The recent Supreme Court opinion in *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), provides support for this argument.

In *J.L.*, officers conducted a *Terry* "stop and frisk" of an individual based on an anonymous call that the individual was carrying a gun. The only physical attributes relayed by the caller were that the male was black, wearing a plaid shirt, and was located at a specific bus stop. *Id.* at 271–72, 120 S.Ct. 1375. In a unanimous opinion, the Court ruled that the call, without more, was insufficient to support a finding of reasonable suspicion necessary to justify the *Terry* stop. In holding that the stop violated J.L.'s Fourth Amendment rights, the Court articulated its concerns with an uncorroborated anonymous call:

> The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for sus-

pecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had information about J.L. *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375. Although *J.L.* dealt with a *Terry* stop, its reasoning applies to evaluating whether probable cause exists for a warrantless entry into a residence. *E.g., Kerman v. City of New York*, 261 F.3d 229, 236 (2d Cir.2001) ("[W]e believe that the Court's reasoning in *J.L.* controls the issue here: whether an uncorroborated and anonymous 911 call is sufficient to establish probable cause for a warrantless entry into a dwelling."); *United States v. Fisher*, 145 F.Supp.2d 853, 858 (E.D.Mich.2001) (concluding that *J.L.* provided "decisive guidance" on the issue of whether an anonymous 911 call provided sufficient probable cause for warrantless entry into defendant's hotel room).

In this case, the caller who reported the alleged shooting declined to identify himself, and the only corroborating evidence that he gave to the dispatcher was the address and that the defendant's residence had a security camera above the door. Following the 911 call, the dispatcher relayed the following information to the officers over the radio:

> Respond on a gunshot at 3227 Flanders Avenue, 3 2 2 7 Flanders Avenue. A citizen said that um, that she got shot in the hand in the house at that address, said that, apparently whoever in the house was trying to uh, tie the man's hand up to stop it from bleeding, apparently it's got to be a male caller that's shot in the hand, 22:38

(Tr. 911 Tape, Gov't Ex. D.)[5] Given the reasoning in *J.L.*, this information alone is likely insufficient to support a finding of probable cause to enter the defendant's apartment. *E.g., Kerman*, 261 F.3d at 236 (anonymous 911 call that a mentally ill man was possibly brandishing a gun was insufficient, by itself, to establish probable cause to enter residence). Yet, the officers in this case possessed more information than did the officers in *J.L.* The additional information available to the officers differentiates this case from *J.L.* and supports a finding that probable cause existed to enter the defendant's apartment.

■ To begin with, the anonymous call was made from an address located approximately two-tenths of a mile from the defendant's residence, a fact that was relayed to the officers in a subsequent dispatch. Thus, although the officers did not know the identity of the caller, they did know the call was made from a location close to the defendant's building. This supports an inference that the witness observed the crime for which he made the 911 call. When the officers arrived at the building, they noticed that apartment A was unoccupied. Apartment B appeared to be occupied, and had a security camera above its door. In the officers' experience, such cameras are associated with drug trafficking. Given the high prevalence of firearms associated with drug trafficking, this fact supports the conclusion that a shooting victim could be in the occupied apartment. Finally, the officers testified that they knew the area in which the defendant lived

to be a high crime area, another fact supporting the veracity of the 911 call. These facts, combined with the nature of the crime involved—a potential shooting—convince the court that under the "totality of the circumstances," probable cause existed to enter defendant's residence to search for evidence of a crime: specifically, evidence that someone had been shot in the hand.

■ Even assuming that the officers lacked probable cause to enter the defendant's residence based on that information, they first knocked on his door prior to entering the apartment. In knocking on his door and attempting to obtain consent to enter the apartment, the officers' actions did not implicate the Fourth Amendment. *United States v. Cephas*, 254 F.3d 488, 493 (4th Cir.2001) (noting that "officer[s] generally do[ ] not need probable cause or reasonable suspicion to justify knocking on the door and then making verbal inquiry"). During the course of their conversation with the defendant, the officers observed that he was sweating profusely and that he appeared to be agitated. These additional observations, in light of the information already available to the officers, gave them probable cause to enter the apartment and search for evidence that a shooting had taken place and that a victim might be inside.

### Exigent Circumstances

■ The most common exigency recognized by the Fourth Circuit occurs when

---

5. The officers testified that subsequent to a 911 call, the dispatcher relays information to them by radio transmission and via computer transmission. They each have a computer in their patrol car which receives this information. In this case, the radio dispatch received by the officers makes no mention of the security camera above the defendant's door. The officers testified that this information was, however, relayed via computer. Yet, at least

one officer testified that the officers received the radio transmission prior to approaching the defendant's apartment but had not yet received information via the computer. Based on this testimony, the court considers the radio transmission, not the computer transmission, to be the information known to the officers at the time they approached the defendant's apartment complex.

officers "reasonably believe that [ ] evidence may be destroyed or removed before they can obtain a search warrant." *Turner,* 650 F.2d at 528.[6] Another judicially-recognized exigency is when the delay in obtaining a warrant poses a threat to the safety of the officers or the general public. *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *see also Jones,* 239 F.3d at 720; *United States v. Reed,* 935 F.2d 641, 643 (4th Cir.1991) (per curiam) (holding that presence of guns within a residence, because of the inherent danger involved, justifies "searches and seizures on the basis of exigent circumstances"). To justify a warrantless entry under this exception, the officers' belief that an exigency exists must be objectively reasonable, and the existence of exigent circumstances "must be determined as of the moment of the warrantless entry of the officers onto the premises." *Reed,* 935 F.2d at 643.

■■■ There can be no question that the officers had an objectively reasonable belief that the safety of someone within the residence, and, indeed, their own safety, could be jeopardized by a delay in searching the apartment. Only a short amount of time had elapsed between the 911 call and the officers' arrival, and the officers had no idea whether the alleged shooter or victim were still inside the apartment. *See United States v. Mason,* 966 F.2d 1488, 1492–93 (D.C.Cir.1992) (holding that 911 call of shooting, when officers did not know whether gunmen were still in residence, justified warrantless entry). The officers could also have reasonably believed that a

delay on their part might allow the suspected shooter to remove or hide the firearm involved in the reported shooting. *Reed,* 935 F.2d at 643. The defendant's suspicious demeanor during his brief conversation with the police officers contributes to the court's conclusion that the officers had an objectively reasonable belief that exigent circumstances existed. Thus, in "viewing the situation in its totality," the court finds that the officers could have reasonably found exigent circumstances justified their warrantless entry into the defendant's apartment. *Id.*

■■■ Moreover, because the officers were responding to a report that a victim had been shot in the hand, a delay could also have jeopardized the well-being or life of the victim. This exigency justifies the warrantless entry into the defendant's apartment under the so-called "emergency doctrine." *See United States v. Moss,* 963 F.2d 673, 678 (4th Cir.1992); *see also Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "This particular exigency is expressed as one of reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." *Moss,* 963 F.2d at 678; *see also United States v. Presler,* 610 F.2d 1206, 1210 (4th Cir. 1979). Under this exception, the officers must have an objectively reasonable belief that an emergency has occurred and that someone within the residence is in need of immediate assistance. *Id.; see also Unit-*

---

**6.** Citing *United States v. Rubin,* 474 F.2d 262, 268 (3d Cir.1973), the Fourth Circuit listed the following factors for a court to consider in determining whether exigent circumstances exist:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Turner,* 650 F.2d at 528.

ed States v. Richardson, 208 F.3d 626, 629–30 (7th Cir.2000). Finally, warrantless entry pursuant to this doctrine is subject to an important limitation: the officers' search of the residence must be "limited by the type of emergency involved." Moss, 963 F.2d at 678.

Given that the officers had probable cause to believe that a shooting victim was inside the defendant's residence, see supra 498–500, the court concludes the warrantless entry fell within the ambit of the "emergency doctrine." E.g., United States v. Arcobasso, 882 F.2d 1304, 1306 (8th Cir.1989) (reasonable belief of shooting victim in need of immediate aid within residence was sufficient exigency for warrantless entry); United States v. Gillenwaters, 890 F.2d 679 (4th Cir.1989) (warrantless entry justified when police responding to a reported stabbing).[7] The officers' search was also limited to a quick sweep of the apartment, and they did not expand on that search until they obtained the defendant's consent. See supra note 4. Accordingly, the court finds that the officers' warrantless entry into the apartment comported with the requirements of the emergency doctrine.

Thus, the officers' warrantless entry into the residence was justified by the potential safety threat to the officers and any occupants in the apartment. The warrantless entry was also justified by the officers' objectively reasonable belief that a victim within the apartment was in need of immediate aid.

### III. Conclusion

The court finds that the officers had probable cause to enter the defendant's apartment, and that exigent circumstances justified their doing so without a warrant. The defendant does not challenge the officers' actions once they entered his apartment, and the court finds that the officers' subsequent conduct did not violate the Fourth Amendment.[8] Accordingly, the defendant's motion to suppress is DENIED.

The Clerk is DIRECTED to send a copy of this Opinion to defense counsel and the United States Attorney's office.

**IT IS SO ORDERED.**

nunc pro tunc February 12, 2002 [9]

---

**7.** It is unclear whether officers need probable cause to enter a residence pursuant to the "emergency doctrine". Compare Tierney v. Davidson, 133 F.3d 189, 196–97 (2nd Cir. 1998) (citing 3 Wayne LaFave, Search and Seizure § 6.6(a), at 391 (3d ed.1996)) (probable cause required), with United States v. Cervantes, 219 F.3d 882, 887–88 (9th Cir.2000) (no probable cause requirement). The only guidance from the Fourth Circuit that this court could find indicated that the circumstances justifying entry under the emergency doctrine "are exactly comparable to those which justify entries under the more commonly encountered 'exigencies.'" Moss, 963 F.2d at 678. This language arguably encompasses the probable cause requirement. Because the court finds that the officers had probable cause to enter the residence, there is no need to address whether a lesser standard

would justify their warrantless entry pursuant to the emergency doctrine.

**8.** Defendant initially challenged the validity of the later obtained search warrant for his apartment. However, in oral argument on the motion to suppress, defense counsel conceded that the defendant's only viable claim in the motion to suppress was the legitimacy of the officers' initial entry into the defendant's residence. Defendant conceded that all actions taken by the officers subsequent to entering his apartment did not violate his constitutional rights, if the original entry was constitutional.

**9.** The court issued its opinion orally from the bench on this date, but reserved the option to file a written opinion at a later date.