**UNITED STATES of America**

v.

**Turkeshia GILLESPIE, Defendant.**

**No. CR.A.304CR00031.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

Aug. 12, 2004.

Timothy J. Heaphy, Charlottesville, VA, for Plaintiff.

David L. Heilberg, Martin & Raynor, P.C., Charlottesville, VA, for Defendant.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

Before the court is the defendant's motion to suppress evidence seized and statements made subsequent to a warrantless entry of her residence by two Albemarle County police officers. For the reasons set forth below, the court finds that the officers' entry into the defendant's home violated her Fourth Amendment rights. Accordingly, the court will grant the defendant's motion to suppress both the evidence and statements obtained as a result of the illegal entry.

## I. Facts [1]

On February 5, 2004, Albemarle County Police Officer Shaun James Campbell went to Turtle Creek Apartments, building 127 apartment 6, in order to serve a warrant for a capias on the defendant, Ms. Gillespie, for failing to appear in court to answer a charge for driving with a suspended license, a misdemeanor. Officer Campbell first stopped at the Turtle Creek Leasing Office to confirm that Ms. Gillespie was renting that apartment. The officer discovered that she was leasing the apartment from an owner, and he obtained the phone number of the actual apartment owner.

Officer Campbell proceeded to the apartment and, after hearing someone inside, he knocked on the defendant's door. The officer observed the peephole on the door get dark and light again, as if someone looked through it. When no one answered the door, the officer knocked several more times, and then went around to the rear of the apartment and observed that the apartment had a second floor balcony. Then, the officer called for another unit to assist him. When the second officer, Corporal Tripp Martin, arrived, they knocked on the door again and received no response. Then, both officers went around to the back of the apartment and observed that the back door was slid

---

1. At the August 10, 2004 suppression hearing before this court, the government and the defendant both stipulated that the factual record for the defendant's motion consists of the testimony of Officer Campbell and Detective McKay in the General District Court for Albemarle County, Virginia on March 25, 2004. A transcript of this testimony (hereinafter "Transcript") was presented to this court as an attachment to the defendant's motion to suppress filed on June 30, 2004.

open, there were fresh footprints in the snow indicating that two people had jumped off the balcony, and there was a black head-covering in the snow which had not been there before. At that point, the officers called for a K–9 unit to track the people who had fled from the apartment, but the unit was not successful in tracking the suspects.

During the officers' visit to Turtle Creek Apartments, the officers were told by another resident that Ms. Gillespie had two young children, approximately two and four years of age. At some point, the officers heard the sound of a child crying, but they could not tell which apartment the sound was coming from because there were four doors right next to each other (including the defendant's door). The officers then tried to contact the owner of the apartment and ended up talking to her son-in-law, Mr. Rojas, who handled her business affairs. The officers asked Mr. Rojas if he would come over to the apartment with the key and let them in to check on the welfare of the children whom they believed to be inside, and he complied. Mr. Rojas traveled from Earlysville to Turtle Creek Apartments, in Charlottesville, and proceeded to let the police officers into Ms. Gillespie's apartment.

Once Mr. Rojas opened the door, the officers heard no crying children, and they discovered no children in the apartment after searching it. Instead, the officers observed two bulletproof vests on the sofa in the living room, and several digital scales, some firearm magazines and a box of baking soda lying in an open duffle bag on the floor in the back bedroom. At that point, Ms. Gillespie arrived home and the police arrested her based on the original misdemeanor arrest warrant. Then, the two officers called detectives from the Jef-

ferson Area Drug Enforcement (JADE) Task Force to come to the apartment. JADE Detective McKay arrived, spoke with the officers who were already there, went into the back bedroom and observed a bag of cocaine.[2] He field tested the substance and it tested positive for cocaine. Detective McKay then told Ms. Gillespie that he had found cocaine in her apartment, and asked her for consent to search her apartment. Ms. Gillespie agreed and signed a written waiver to consent to a search of her apartment.

After Ms. Gillespie consented to the search, the police found a large amount of cash, a large amount of crack, scales, powder cocaine, a lock box, weapons, and magazines. Later, at the JADE Office, Ms. Gillespie admitted to the detectives that she allowed two men to use her apartment to convert powder cocaine into crack cocaine on several occasions. In return, the men paid her for the use of her apartment.

## II. Discussion

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. AMEND. IV. While the Fourth Amendment protects the individual's privacy in a variety of settings, nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Indeed, it is widely recognized that physical entry of the home is "the chief evil" against which the protections of the Fourth Amendment apply. *United States v. United States Dist. Ct.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

2. While the government argued at the suppression hearing that the cocaine was in plain view, it is unclear from the testimony of Offi-

cer Campbell and JADE Detective McKay whether this was the case. *See* Transcript at 27, 33.

Because of this heightened privacy interest, warrantless entry into an individual's home is presumptively unreasonable. *Payton,* 445 U.S. at 586, 100 S.Ct. 1371. The government presents two related justifications to overcome this presumption of unreasonableness: (1) that there was an emergency exigency, and (2) that the police were performing a community caretaking function. Neither of these justifications, however, is weighty enough in this case to overcome the presumption that this search was unreasonable.

## A. Exigent Circumstances and the Emergency Doctrine

A warrantless search of a home may be conducted when the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393–94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Exigent circumstances arise where "law enforcement officers confront a compelling necessity for immediate action that would not brook the delay of obtaining a warrant." *United States v. Wiggins,* 192 F.Supp.2d 493, 498 (E.D.Va.2002) (quoting *United States v. Tibolt,* 72 F.3d 965, 969 (1st Cir.1995)). The government bears the burden of demonstrating the existence of exigent circumstances to overcome the presumption of unreasonableness. *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

■ One exigency that is sometimes recognized by courts to excuse a warrantless search is one justified by the "emergency doctrine." *See United States v. Moss,* 963 F.2d at 678; *see also Mincey,*

437 U.S. at 392, 98 S.Ct. 2408 (finding that "the need to protect or preserve life or avoid serious injury" may justify a warrantless search of a home). "To invoke this so-called 'emergency doctrine,' the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss,* 963 F.2d 673, 678 (4th Cir.1992); *see also Mincey,* 437 U.S. at 392, 98 S.Ct. 2408 ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.") In addition, the Fourth Circuit has emphasized that this "emergency exigency" exception to the warrant requirement justifies "immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." *Moss,* 963 F.2d at 678. When analyzing whether an exigency exists, courts should give some deference to the decisions of trained law enforcement officers and avoid " 'unreasonable second guessing' of the officers' assessment of the circumstances that they faced." *Figg v. Schroeder,* 312 F.3d 625, 639 (4th Cir.2002). However, courts must also analyze an officer's decision in light of the objective evidence to make sure that it is in fact reasonable.

■ This kind of emergency was not present in the case at hand. The officers stated that they were concerned that the sound of the child crying was coming from Ms. Gillespie's apartment,[3] and that the two people who had jumped off the balco-

---

**3.** In his testimony, Officer Campbell was unclear during direct examination about when he heard the sound of a child crying and how long it lasted. He stated that when he heard a child crying "[he did] not know if it was without interruption or not." (Transcript at 15.) On redirect, Officer Campbell indicated

that when he was outside the apartment with just Corporal Martin, he knew that Ms. Gillespie had young children, but had not yet heard any crying; he stated, "I had not heard—I cannot say that I heard crying before [Mr. Rojas arrived]." (Transcript at 17.)

ny of the apartment and fled may have left the children unattended in the apartment. Although the officers may have believed that there were children in the apartment and been genuinely concerned about them, their belief that this situation rose to the level of an *emergency which required immediate entry* is not objectively reasonable. An objectively reasonable officer, with knowledge that Ms. Gillespie had young children who may have been left alone and upon hearing the sound of crying children somewhere in an apartment building, would not assume that this rose to the level of an emergency which required immediate entry (especially if he had not taken steps to rule out adjoining apartments as the source of the crying). Certainly, an objective officer might be concerned and could investigate the matter further, perhaps by contacting the mother, but would probably not conclude that a warrantless entry was necessary. Moreover, even if this court were to conclude that an objectively reasonable officer would believe that this were an emergency requiring immediate entry, the law also requires that these particular officers actually hold that belief. Their claim that they believed this was such an emergency is belied by the evidence.

■ The evidence shows that the officers did not actually believe that an emergency existed that required *immediate* entry into the apartment. Officer Campbell estimated that he was outside Ms. Gillespie's apartment for about an hour before he called Mr. Rojas requesting to be let into the apartment. In addition, it took Mr. Rojas an estimated fifteen minutes to get to the apartment from Earlysville, Vir-

ginia. If the officers had believed that the children were in immediate danger, then they would not have waited outside the apartment for over an hour before entering.[4] If the officers had thought that this was indeed an "emergency," then they would have either forced the front door to the apartment open, jumped up on the balcony and gone through the open balcony door, or run to the leasing office of the apartment complex to get a key to the apartment.

This case can be distinguished from *United States v. Porter*, where this court found that the emergency doctrine justified the officers' warrantless entry into a home whose alarm had sounded after a neighbor's child had apparently opened the door to the house. 288 F.Supp.2d 716 (W.D.Va.2003). In this case, the police were not summoned to the apartment by an alarm or similar call of emergency. The officer arrived at Ms. Gillespie's apartment, and after suspecting that someone had fled the apartment, started investigating the surrounds of the apartment by walking around to the balcony and interviewing neighbors. In *Porter*, the police were not investigating a resident of the house, but rather were genuinely concerned that there could be a burglary going on inside and that an occupant of the house might be in danger. In this case, the officer suspected illegal activity by an occupant of the apartment, giving him more than one reason for wanting to enter the apartment. This situation raises the possibility that he was exaggerating his belief that there were endangered children inside so that he could search the apartment for contraband.[5]

4. The government argued in the August 10, 2004 suppression hearing that the officers waited an hour before taking action because they could hear children crying for that entire hour, and only after hearing an hour of constant crying did they conclude that this was an emergency. This account, however, is

contradicted by the transcript of Officer Campbell's testimony as described in note 3, *supra.*

5. Another plausible explanation for Officer Campbell's actions may have been that he believed that Mr. Rojas had legal authority to

## B. Community Caretaker Doctrine

■ The government also relies on the "community caretaker" doctrine, which is very similar to the emergency doctrine, to justify the officers' warrantless entry of the defendant's apartment. This exception to the warrant requirement allows officers who are serving as "community caretakers," protecting the safety of persons or property, to make warrantless searches. *See Phillips v. Peddle,* 7 Fed.Appx. 175, 178 (4th Cir.2001). However, two important limitations to this doctrine limit its application in general and prevent its operation in this case.

■ First, the Supreme Court has described "community caretaking functions" as those which are *totally divorced* from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (emphasis added). Similarly, in *United States v. Gwinn,* when recognizing a kind of community care-taking exception, the Fourth Circuit emphasized that an essential premise of its holding "is the fact that nothing in the record suggests that [the officer's] reason for the reentry was pretextual or that he acted in bad faith." 219 F.3d 326, 335 (4th Cir. 2000) (finding that officer's reentry into suspect's home to obtain suspect's shoes and shirt was not a Fourth Amendment violation).

Second, most cases that rely on the community caretaking doctrine involve the search of an automobile, and courts have been quick to point out that using it to justify warrantless entry into a home is more suspect. *See Phillips,* 7 Fed.Appx.

at 178; *see also Cady,* 413 U.S. at 439, 93 S.Ct. 2523; *United States v. Newbourn,* 600 F.2d 452, 454 (1979) ("for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars"). In fact, the Supreme Court has never applied the community caretaking doctrine to justify warrantless entry of a home. *See Wood v. Commonwealth,* 27 Va.App. 21, 497 S.E.2d 484, 487 (1998) (en banc) ("[T]he Supreme Court has yet to decide whether a situation might exist that would justify a warrantless intrusion into an individual's home under the 'community caretaker doctrine,' as distinguished from an emergency or exigent circumstances."). *Cady,* the seminal decision which describes the community caretaking rationale, authorized an officer to perform a warrantless search of a vehicle, not a home. 413 U.S. at 441, 93 S.Ct. 2523 ("Local police officers... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what... may be described as community caretaking functions....").

In the few cases where courts have applied this rationale to justify the warrantless search of a home, they have emphasized that the entry was unrelated to the investigation of criminal activity. In *Phillips,* the Fourth Circuit relied on the caretaker rationale to find that it was reasonable, for § 1983 qualified immunity purposes, for an officer to enter the home of an individual who he thought was in danger for agreeing to be a witness in a criminal case. 7 Fed.Appx. at 180. However, the court emphasized that the officer "was not involved in a criminal investigative matter and left immediately upon

give valid consent to the police to search the apartment. After discovering that Mr. Rojas's consent was invalid for Fourth Amendment purposes, the officer may have relied more heavily on an exigency explanation. *See Chapman v. United States,* 365 U.S. 610, 616–

17, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (absentee landlord cannot give valid consent to search tenant's home). The parties in this case do not dispute that Mr. Rojas lacked the legal authority to give consent to the police to search the apartment.

**930**

determining that Phillips was safe." *Id.* Similarly, when the Sixth Circuit relied on the community caretaking doctrine to justify the warrantless entry of police into a home in order to turn down blaring music that had woken up several neighbors in the middle of the night, the court focused on the fact that "the officers here did not enter a private home for the purpose of questioning a suspect or searching for evidence of a suspected offense." *United States v. Rohrig,* 98 F.3d 1506, 1521 (6th Cir.1996).

In *Wood,* the Virginia Court of Appeals, sitting en banc, rejected an argument that the community caretaking doctrine justified police officers' search of a home for a missing juvenile. 497 S.E.2d at 486. The court found that "the community caretaking function used to uphold a vehicle search, such as existed in *Cady,* may not be sufficient to justify an intrusion into an individual's home." *Id.* at 487. In addition, in that case, "the evidence indicated that the search was a 'pretext concealing an investigatory police motive,'... [therefore it] cannot be deemed a valid exercise of the community caretaking function." *Id.* at 488 (quoting *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)).

As in *Wood* and unlike the *Phillips* and *Rohrig* cases, the officers in this case were involved in a criminal investigative capacity when they entered Ms. Gillespie's home. Although Officer Campbell was not visiting the apartment as part of an investigation initially, his suspicions of criminal activity quickly developed when no one came to the door and the persons inside the apartment appeared to have fled. The fact that Officer Campbell had switched to an investigative mode is supported by the fact that he called for backup, requested a K–9 unit to assist him, and started to interview neighbors about Ms. Gillespie. Although the police may have been somewhat concerned about the possibility that there may have been children inside, the police officers may have also been using the welfare of the children as a pretext for getting into the apartment.

In addition, if the police had actually been concerned about the welfare of the children, they could have simply asked the leasing office or the landlord, both of whom the police spoke with, for Ms. Gillespie's phone number at work so that they could call her and find out if her children were inside the apartment. (In fact, the leasing office had Ms. Gillespie's work phone number.) The officers also did not call Child Protective Services about the children. Finally, the officers could have knocked on the three adjacent doors in the apartment complex to find out if the sound of crying children was actually coming from their apartments and not Ms. Gillespie's apartment before they went to the trouble of trying to get inside Ms. Gillespie's apartment.[6]

█ Policy considerations also weigh against finding that a warrantless search

**6.** The Supreme Court, in *Cady,* dismissed the defendant's argument that the police should have refrained from searching the car, and instead should have pursued other "less intrusive" means of protecting the public. 413 U.S. at 447, 93 S.Ct. 2523. ("The fact that protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable.") This case can be distinguished from *Cady* on this point in two ways.

First, in our case, a home was searched without a warrant, not a car. Second, it would not have taken any additional police resources for the police to ask the leasing office for Ms. Gillespie's phone number to contact her about the children or to knock on neighbor's doors—unlike in *Cady,* where the less intrusive alternative was not as feasible and would have required significant additional resources.

of a home can be justified by an officer's concern about the welfare of children who may or may not be located inside a home. If the police can justify warrantless searches of homes based on their concern that there may be children inside who are unattended, that could justify many warrantless searches of homes of suspects who have children. Concern for the welfare of children should only rise to an exigency if the police are reasonably certain that children have been abandoned in a home, and have a reasonable belief that they are in some kind of danger. A mere belief that young children could be home alone should not be enough to overcome a person's Fourth Amendment protection against warrantless searches.

## C.  Consent and Subsequent Statements to Police

■ Physical and verbal evidence obtained as a result of an illegal search must be suppressed unless the evidence or statement was obtained after an intervening "act of free will [sufficient] to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Factors relevant to the inquiry of whether the primary taint has been purged include: "(1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998) (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). In addition, "the burden of showing admissibility rests ... on the prosecution." *Seidman*, 156 F.3d at 548 (citing *Brown v. Illinois*, 422 U.S. at 604, 95 S.Ct.

2254). In this case, the oral and written consent that Ms. Gillespie gave authorizing a further search of her apartment and the subsequent statements that she made to the police were not purged of the taint of the illegal search by any intervening act. Therefore, the consent is invalid and the statements should be suppressed.

Under the first *Brown* factor, very little time passed between the illegal search and Ms. Gillespie's statements to police and consent to a further search of her apartment. Officer Campbell was just finishing up his search of the defendant's apartment when she arrived home. The officers arrested her, and called the JADE detectives to assist them. Detective McKay arrived, promptly field tested the cocaine found in her bedroom, and informed Ms. Gillespie that he had found cocaine in her apartment and that she could either consent to a further search or he would obtain a warrant. At that point, she consented to the search. In addition, she later made statements to the detectives at the JADE office about her involvement with the drug conspiracy. This interview presumably was conducted right after she was arrested and taken to the police station.[7] Therefore, Ms. Gillespie's consent and subsequent statements were all made during this unbroken and rapid chain of events.

Under the second *Brown* factor, there were no intervening circumstances that could have purged the taint of the illegal search. In *Seidman*, the taint from the officer's unlawful entry was purged by the defendant's welcoming the officer further into his home and their forty-five minute long conversation about personal matters. 156 F.3d at 549. In this case, there were

---

7. Officer McKay's testimony about when his interview of Ms. Gillespie took place is unclear. *See* Transcript at 35. Since the government has the burden of proof to show that the taint has been purged, and the govern-

ment offered no evidence to show that a significant amount of time passed before this interview, the court will presume that this interview took place shortly after the arrest.

no such intervening actions or conversations that purged the initial illegal entry. The court also pointed out in *Seidman* that the defendant was not present "when incriminating evidence was found in an illegal search of his home [nor was he] confronted by the police with incriminating evidence that they had illegally seized." *Id.* In contrast, Ms. Gillespie was specifically told by Detective McKay that he had found cocaine in her apartment, and that he would get a search warrant if she did not consent to a search of her apartment. Therefore, the facts indicate that there was not sufficient attenuation between the illegal search and her consent. In addition, the government offered no evidence that there were any intervening circumstances between the illegal search and the statements that she made to the police when taken to the station.

Finally, although it does not appear that the Fourth Amendment violation in this case was "flagrant," this was a warrantless search of a home, which the Fourth Amendment is specifically designed to protect. In addition, the evidence tends to support the notion that the police officers' stated motive for entry—to check on the welfare of the children—may have been a pretext for an investigatory search for contraband. Although the third factor may not weigh in favor of suppression, the court concludes that, after evaluating the three factors together, the primary taint of the unconstitutional search was not purged. The government has not met its burden of showing the admissibility of these statements.

### III. Conclusion

For the foregoing reasons, the court finds that no exigent circumstances existed at the time the officers entered the defendant's apartment and that the officers' entry was not justified by the community caretaking doctrine. In addition, the consent that the defendant gave to the police after she was confronted with the evidence found in the initial illegal search did not validate the officers' subsequent search because it was not sufficiently attenuated from the unlawful entry. Finally, the statements that the defendant made to the detectives at the police station were also tainted by the initial search and must be suppressed. Accordingly, the defendant's motion to suppress and set aside the illegal search and subsequent statements to the police shall be granted. An appropriate order shall this day issue.

The Clerk of the Court hereby is directed to send a certified copy of this memorandum opinion to all counsel of record.