Kwame R. JOSEPH, Appellant

v.

UNITED STATES, Appellee.

No. 00–CF–942.

District of Columbia Court of Appeals.

Argued Nov. 25, 2003.
Decided June 28, 2007.

Jennifer Lanoff, Public Defender Service, with whom James Klein and Jaclyn S.

Frankfurt, Public Defender Service, were on the brief, for appellant.

Geoffrey A. Barrow, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese, III, and Marc O. Litt, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, and TERRY and SCHWELB, Senior Judges.*

TERRY, Senior Judge:

Appellant was charged in an indictment with carrying a pistol without a license, possession of an unregistered firearm, unlawful possession of ammunition, and possession of a controlled substance (marijuana). After an evidentiary hearing, the trial court denied appellant's motion to suppress tangible evidence (the pistol, the ammunition, and the marijuana). Appellant then entered a conditional guilty plea[1] and was sentenced to concurrent prison terms totaling five years; execution of that sentence was suspended, however, and he was placed on probation for thirty-three months. Before this court appellant argues (1) that the evidence should have been suppressed because the citizen informant's reliability and basis of knowledge were not properly considered, and that if they had been, a *Terry* stop and frisk[2] would not have been justified, and (2) that the trial court erred by denying his discovery request for an audiotape

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

1. *See* Super. Ct.Crim. R. 11(a)(2).

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

of a 911 telephone call made on the day before his arrest, in which someone who may have been that same informant allegedly provided an inaccurate tip regarding the same location. We affirm.

I

A. *The Suppression Hearing*

On February 11, 1999, at 9:24 p.m., a telephone call came in to the Metropolitan Police Department over the 911 emergency line. The male caller reported that a man with a gun "in the side of his waist" was standing in front of a house at 646 Newton Place, N.W. The caller said that his last name was Williams and gave the dispatcher his address and telephone number.[3] Williams went on to say that the man with the gun was wearing a grey sweatshirt, blue jeans, and brown Timberland boots.[4] At the conclusion of the telephone call, the dispatcher directed two patrol cars to go to 646 Newton Place. One of these cars was driven by Officer John Hackley.

Officer Hackley testified that he was on duty in the area of 3200 Georgia Avenue, N.W., when he received a radio call instructing him to go to 646 Newton Place because of a report of a man with a gun standing outside that address wearing "a grey sweat jacket and blue jeans." The officer was in a police car only four blocks from 646 Newton Place, so he arrived there in less than a minute. When he reached that address, Officer Hackley saw three men; one of them—appellant—was wearing a grey sweatshirt and blue jeans, but the other two did not match the clothing description given by the dispatcher.[5]

Officer Hackley approached appellant and said that he had received a report of a man with a gun and that appellant fit the description given in the report. The officer immediately conducted a patdown for weapons, in the course of which he felt a hard metallic object of a size consistent with a gun. When he lifted appellant's shirt, Officer Hackley found a loaded pistol in appellant's waistband and promptly placed him under arrest. A search incident to that arrest yielded a bag of marijuana from appellant's pants pocket.

At the suppression hearing, the government played an audiotape of the 911 call that precipitated appellant's arrest. Dur-

---

**3.** When the dispatcher asked him to repeat the phone number, however, the number he gave was slightly different the second time.

**4.** The 911 call was not transcribed, but a copy of the audiotape is included in the record, and both parties quote from it in their briefs. Highlights of the audiotape include the following:

(1) the caller describes the man with the gun outside 646 Newton Place as wearing blue jeans, a grey sweatshirt, and brown Timberland boots; he is said to be standing with "two or three" other men;

(2) the caller gives his last name as Williams;

(3) Williams tells the dispatcher either that he lives at 646 Newton Place, or that his grandmother lives at 646 Newton Place (he says that the gunman is standing "in front of my building, my grandmother's

building," but also says, "I live at 646 Newton Place");

(4) Williams gives his complete telephone number to the dispatcher;

(5) Williams asks to have the 911 conversation kept confidential;

(6) Williams informs the dispatcher that there are two children and a girl in front of the building; and

(7) the 911 dispatcher repeatedly says to Williams that he made the same call the day before, but from a different location; Williams denies the truth of the dispatcher's assertion each time it is made.

The dispatcher's subsequent radio broadcast referred to a report of "a man with a gun in front of 646 Newton Place, Northwest, wearing a grey sweatsuit, jeans, in front of 646 Newton...."

**5.** The other two men, however, were wearing blue jeans.

ing that call, the police dispatcher mentioned to the caller that she had received a similar call from him just a day earlier, but the caller denied it. When the tape finished playing, defense counsel made a discovery request for "the other 911 call," referring to the call that the dispatcher had received the previous day from someone whom she believed to be the same informant, Williams. Counsel wanted to find out whether this other tape could be used to impeach Williams' credibility as an informant. The prosecutor responded that the earlier tape was not relevant because the information in the previous call was not known to, or used by, Officer Hackley when he decided to conduct a *Terry* stop and frisk of appellant. In denying the discovery request, the trial court said that "the question is whether or not this officer was justified in acting upon the call," and whether the officer "acted based on a description that was accurately given.... [T]here was no apparent reason for this officer ... not to act as he did." [6]

At the conclusion of the testimony, defense counsel argued that the evidence should be suppressed under *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), despite the fact that the caller identified himself (which did not happen in *J.L.*). Counsel challenged the quality of the identification made [7] and the caller's basis of knowledge for the informa-

tion he provided, arguing that the informant offered nothing more than "status information ... no information about prediction of future behavior or action that would lend some kind of credibility to that informant's call."

The court denied the motion to suppress because the facts in this case were distinguishable from those in *J.L.*, specifically ruling that the caller "was anything ... but anonymous." In addition, the court held that the specific information given by the caller—the description of appellant, his exact location, and the number of others present—was sufficient to justify the *Terry* stop. Moreover, the court noted that the officer arrived just one minute after the 911 call was made, and that he was able to confirm the specific information related to him by the dispatcher. All of these facts, the court said, gave the officer "a reasonable, articulable suspicion to stop the defendant." The court then concluded that when the officer, in the course of the frisk, felt the gun in appellant's waistband, he had probable cause to lift the shirt and seize the gun. The discovery of the gun, in turn, gave the officer probable cause to arrest appellant, to conduct a search incident to that arrest, and to seize the marijuana from appellant's pocket.

### B. *Post-Hearing Proceedings*

On the day after the hearing, appellant filed a written motion asking the court to

---

**6.** Despite the court's ruling, defense counsel pressed on, arguing that the basis for the stop was the caller's credibility. The court rejected this argument:

> [T]hat would mean that every time somebody calls 911, that the police have to make some kind of independent judgment about a ... caller's credibility?
>
> If I'm sitting in my house and think that I see someone breaking into my neighbor's house across the street, before the police could act, the police would have to make some kind of independent judgment, investigation, about my credibility before they

could come to the scene. That's the logical extent of your argument, it seems to me.

So I'll deny your motion and we'll move on.

**7.** Defense counsel argued (1) that the last name given by the caller, "Williams," was a common name that did not adequately identify him; (2) that the caller had provided two different phone numbers, suggesting that the phone numbers were not his; (3) that the address he gave was incomplete, in that it did not include a specific apartment number; and (4) that the dispatcher believed she was being lied to by the informant.

reconsider its denial of the motion to suppress. Again citing *Florida v. J.L.*, appellant argued that the motion should have been granted because the government had failed to establish the informant's basis of knowledge. The court reaffirmed its denial of the motion to suppress and again distinguished the facts in this case from the facts in *J.L.*:

> And I have to say that on the facts of this case they are somewhat remarkably similar to the facts in *J.L.*, except that this case does not present an anonymous tip because the caller gave a name and a telephone number [and an address] which the dispatcher ... seem[ed] to be able to have some recognition of that telephone number as a number that could be checked by saying something like well, you—I got a call from a different location yesterday.

> And so, unlike *J.L.*, this was not an anonymous tip.

The court specifically mentioned that the dispatcher had knowledge of the caller and relied on this fact to conclude that the dispatcher knew that she could get in contact with him if the tip was erroneous. The court also noted that the informant could be held "accountable" for the information he gave and that the innocent details of his tip were corroborated. The court did state that the verification of innocent details was "not enough for a *Terry* stop" in *Florida v. J.L.*, but it was enough in this case because the informant here was not anonymous and because "in this case we have more."

## II

Appellant contends that the trial court improperly applied the totality of the circumstances test, *see Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), in denying his motion to suppress evidence because the court failed to consider the credibility and basis of the informant's asserted knowledge of appellant's illegal activities. We find his analysis flawed.

### A. Applicable Legal Principles

 Our review of a trial court's denial of a motion to suppress is limited. *See White v. United States*, 763 A.2d 715, 719 (D.C.2000) (citing cases). We must defer to the court's findings of evidentiary fact and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling below. *Id.*; *see, e.g., Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc). The court's legal conclusions on Fourth Amendment issues, however, are "subject to de novo review." *Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991). Essentially, our role as an appellate court "is to ensure that the trial court had a substantial basis for concluding" that no constitutional violation occurred. *United States v. Johnson*, 540 A.2d 1090, 1091 n. 2 (D.C.1988) (citing *Illinois v. Gates*, 462 U.S. at 238–239, 103 S.Ct. 2317); *see Thompson v. United States*, 745 A.2d 308, 312 (D.C.2000); *Goldston v. United States*, 562 A.2d 96, 98 (D.C.1989).

 Under *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. 1868, a police officer must have a reasonable articulable suspicion that a person is engaging in criminal conduct before briefly detaining that person for investigation. The requirement of articulable suspicion, however, "is not an onerous one." *Gomez v. United States*, 597 A.2d 884, 888 (D.C.1991).[8] An officer may conduct a *Terry* stop

---

**8.** Reasonable articulable suspicion has sometimes been defined by differentiating it from probable cause. *See Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Probable cause is "a fair probability that contraband or evidence of a crime

where he has reason to believe that he is
dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Terry,* 392 U.S. at 27, 88 S.Ct. 1868 (citations omitted). Moreover, articulable suspicion

is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White,* 496 U.S. at 330, 110 S.Ct. 2412.

■ Normally, an articulable suspicion arises from an officer's personal observations while on duty. That was the situation in *Terry v. Ohio,* when an officer saw three men apparently "casing" a store, possibly in anticipation of "a stick-up." *Terry,* 392 U.S. at 6, 88 S.Ct. 1868. However, it is well settled that a reasonable articulable suspicion can also be based on an informant's tip. *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Brown,* 590 A.2d at 1014 ("This court has previously upheld stops and frisks on the basis of informants' tips, without requiring ... that the arrest-

ing officer personally observe suspicious conduct" (citations omitted)). In determining whether such a tip establishes a reasonable suspicion, courts usually apply the same totality of the circumstances test adopted in *Illinois v. Gates. See Brown,* 590 A.2d at 1014.

■ Key factors in applying this test and assessing the value of the tip are the informant's credibility and veracity and the basis of the informant's knowledge. *See Gates,* 462 U.S. at 233, 103 S.Ct. 2317. But an informant does not need to state directly the basis of his knowledge because that can often be inferred from the report itself. *Groves v. United States,* 504 A.2d 602, 605 (D.C.1986) ("it was apparent that he was personally observing the occurrence he was then describing"); *see Allen v. United States,* 496 A.2d 1046, 1048 (D.C. 1985) ("basis of knowledge" no longer needs to be proven; courts now apply the "more flexible" *Gates* totality-of-the-circumstances test).

■ If a tip lacks indicia of reliability, no forcible stop can follow without further investigation. *Adams,* 407 U.S. at 147, 92 S.Ct. 1921; *Groves,* 504 A.2d at 605. However, information from an identified citizen is presumptively reliable. *See Gates,* 462 U.S. at 233–234, 103 S.Ct. 2317 ("if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary" (citing *Adams*)); *Parker v. United States,* 601 A.2d 45, 48–49 (D.C. 1991) (citizen informant who gave her name and address to the police and accurately described the location of a car con-

will be found," *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. 2317, whereas articulable suspicion is "substantially less than probable cause." *Brown,* 590 A.2d at 1014; *see United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct.

1581, 104 L.Ed.2d 1 (1989) ("[articulable] suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence"); *accord, Alabama v. White,* 496 U.S. at 330, 110 S.Ct. 2412.

taining a brown paper bag filled with drugs was sufficiently reliable to establish probable cause); *Brown,* 590 A.2d at 1016 ("A person who does not hide behind the cloak of anonymity, but who voluntarily comes forward and identifies himself or herself, is more likely to be telling the truth because he or she is presumably aware of the possibility of being arrested for making a false report"); *Allen,* 496 A.2d at 1048 ("If the citizen claims or appears to be . . . an eyewitness to a crime, the reliability of his or her information is greatly enhanced"); *see also Davis v. United States,* 759 A.2d 665, 670 (D.C. 2000) ("a citizen informant, particularly one who identifies herself, is a 'more credible source than a paid police informant'" (citation omitted)).

B. *The Validity of the Stop and Frisk*

 In this case the caller identified himself by last name, address, and telephone number, thereby removing the case from the *Florida v. J.L.* line of cases involving unidentified informants.[9] The trial court concluded that, with this information on the record, the caller could be held accountable for a false report—as both the Supreme Court and this court have previously recognized. *See Gates,* 462 U.S. at 233–234, 103 S.Ct. 2317; *Brown,* 590 A.2d at 1016. In addition, the reliability of the caller's information was enhanced by the exchange between the dispatcher and the caller. From the telephone call, the court could infer that the citizen was continuously viewing the scene while making the call because he was able to provide additional information when the dispatcher asked a direct question about who else was on the scene at that very moment. The citizen also reported the location of the gun on appellant's body (in his waistband) and

described his clothing and footwear. The officer responded to 646 Newton Place within a minute after receiving the dispatcher's call and was able to confirm the details provided by the 911 caller. Under the totality of the circumstances, this tip was properly deemed reliable and easily afforded Officer Hackley the necessary justification to conduct an investigatory stop and frisk.

We have found tips from citizens sufficiently reliable to justify *Terry* stops even when the caller provides incomplete identifying information. In *Groves* a 911 dispatcher received a telephone call from a man who identified himself by name but gave no address or telephone number. He told the dispatcher that a man currently in a car at a particular intersection had a gun and described the color and make of the car. The dispatcher relayed an abbreviated version of the tip to officers near that location. The officers found a car of that color at the named intersection and noted that, although the make of the car was not an exact match to the tip, it was substantially similar. We held that these facts were enough to establish a reasonable suspicion and sustained the ensuing *Terry* stop. *Groves,* 504 A.2d at 605.

Like *Groves,* the present case involves an identified citizen informant who made a telephone call to a 911 dispatcher. The identified informant in the instant case, moreover, provided not only his name but also his address and telephone number, thereby enhancing his reliability. The dispatcher then relayed an abbreviated version of the tip to a nearby police officer. That officer was able almost immediately to corroborate the tip, as in *Groves,* and thus conducted a frisk, found the gun in

---

9. One such case is *Sanders v. United States,* 751 A.2d 952 (D.C.2000), on which appellant

places great reliance.

appellant's waistband, and placed him under arrest.

In *Groves* we held that there was an articulable suspicion based solely on the statements of an informant who gave his full name, stated that a man with a gun was at a certain intersection, gave a description of the car the man was driving, and pinpointed the car's exact location at the moment of the call. *Groves,* 504 A.2d at 604. These facts are almost identical to the facts in the case at bar, except that Groves was in a car at a particular intersection, whereas appellant was not in a car but standing on the sidewalk in front of a building at 646 Newton Place. Reviewing the facts in the light most favorable to sustaining the trial court's ruling, as we must, *see Peay,* 597 A.2d at 1320, we hold that the identified informant's telephone tip and the officer's immediate corroboration of appellant's location and clothing were sufficient to establish a reasonable articulable suspicion, which in turn sufficed to justify a *Terry* stop and frisk. Abundant case law, including not only *Groves* but also *Allen, Gomez, Parker,* and even *Adams v. Williams,* supports this holding.[10]

## C. *Appellant's Specific Contentions*

Appellant maintains that this case should not be governed by the relevant case law on citizen informants because the informant in this case (1) was anonymous, (2) was not "unquestionably honest," and (3) did not provide any evidence of his basis of knowledge. We address each contention in turn.

### 1. *The Identification of the Citizen Informant*

Viewing the facts in the light most favorable to the government, as *Peay* dictates, 597 A.2d at 1320, we reject appellant's argument that the citizen informant in this case was not sufficiently identified. Because the informant gave his name, address, and telephone number, the trial court could and did reasonably find that the informant "was anything ... but anonymous." This court can overturn that finding only if it was clearly erroneous or unsupported by the evidence, which it plainly was not. *See* D.C.Code § 17–305(a) (2001). Appellant argues nevertheless that the citizen should not enjoy the presumptive reliability of an identified informant because he failed to provide enough information to make him subject to criminal liability. He contends, in particular, that the informant was anonymous because he provided a common last name (Williams), his address lacked an apartment number, and he gave two different telephone numbers (see note 3, *supra*). While these assertions may be true, we are satisfied that there was enough information in the record to enable the court to conclude that the informant was adequately identified and thus should enjoy the presumptive reliability of his tip, especially when we consider that significant details were corroborated by the officer's personal observation.

---

10. The government cites a series of cases in which we have held that anonymous in-person citizen tips can be sufficiently reliable to justify a *Terry* stop, or even to provide probable cause for an arrest, even though the citizen provides no identifying information and leaves the scene before the police take action. *See Davis,* 759 A.2d at 676 (probable cause to arrest); *Ware v. United States,* 672 A.2d 557, 563 (D.C.1996) (*Terry* stop); *United States v.* Walker, 294 A.2d 376, 378 (*Terry* frisk). These and similar cases, while generally helpful, are not directly in point because the informant in the present case identified himself by name, address, and telephone number. If anything, the facts in this case are stronger than the facts in any of those cases, precisely because the caller was not anonymous but was readily identified.

Appellant relies mainly on *United States v. Fisher*, 145 F.Supp.2d 853 (E.D.Mich. 2001), for the proposition that an identified informant does not always entitle an officer presumptively to rely on an informant's tip. In *Fisher* a caller, identifying himself as "Mr. Johnson," reported to the police that an abducted woman was being held at a motel. The court ruled that this informant was anonymous because the tip "could not be traced to the informant" and came from a cell phone which could not be identified, and that "its content was questionable" because "the officers discovered nothing to corroborate the tip." *Id.* at 859. In the present case, by contrast, the informant gave a name, an address, and a telephone number (indeed, the trial court specifically noted that the contact information could be traced), and the information he provided was corroborated. *Fisher* is thus of no help to appellant.

### 2. *"Unquestionably Honest"*

Appellant also argues that an identified informant's tip is not entitled to presumptive reliability if it is not "unquestionably honest."[11] His analysis of the law misses the mark. In the cases he cites in his reply brief on this issue, the presumptive reliability of an identified informant failed because of possible bias or motive to falsify, not because the informant was anything other than "honest." In particular, there was nothing in this case to suggest that the informant had any bias or motive to falsify information. He was not an estranged spouse,[12] an angry offspring,[13] or a "concerned" neighbor[14] of the defendant—specific situations that may warrant closer than usual scrutiny because of the connections between the parties and their possible desire to harm one another. Furthermore, in those cases there was no information that could be instantly corroborated, as there was here. In the case at bar, the information provided by the caller was corroborated by the police officer within a minute of the telephone call, a fact which dispels much of the doubt (if there is any) about the reliability and veracity of at least a part of the caller's tip.[15]

Appellant further contends that the informant's identity should have been examined more thoroughly by the police and that the tip should have been subject to greater scrutiny before the officer conducted a stop and frisk because the dispatcher seemed incredulous and possibly thought the informant was lying when he denied having given similar information a

---

11. *Gates*, 462 U.S. at 233, 103 S.Ct. 2317.

12. *See United States v. Phillips*, 727 F.2d 392, 393 (5th Cir.1984) (defendant's estranged wife reported that he had a sawed-off shotgun in his home).

13. *See Dial v. State*, 798 So.2d 880, 881 (Fla. Dist.Ct.App.2001) (defendant's daughter reported that he had marijuana and counterfeit money in his home).

14. *See State v. Morris*, 444 So.2d 1200, 1202 (La.1984) (citizen reported on neighbor's possession of marijuana because of concern over children's welfare).

15. In *Florida v. J.L.*, a case in which the tipster, unlike the caller in this case, was anonymous, the Supreme Court said:

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. *Cf.* 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

529 U.S. at 272, 120 S.Ct. 1375.

day earlier.[16] During the 911 call, the dispatcher asked the informant several times whether he had called to report the same information the previous day, and each time he said he had not. The dispatcher finally ended the inquiry after the caller denied that he "called this same thing in yesterday," but "from another location."[17] Appellant suggests that this exchange should have caused the police to investigate the tip more thoroughly before acting on it. We do not agree. The dispatcher knew the caller's name, address, and telephone number; furthermore, there was a tape recording of the call. The dispatcher, therefore, would have been able to trace the citizen if his tip was found to be false. Instead, the description of the suspect was corroborated within minutes, suggesting that at least the identifying information he provided was indeed true.[18] *Cf.* note 15, *supra.*

### 3. *Basis of Knowledge*

Appellant maintains that the trial court erred in finding the tip reliable because the government failed to present any evidence of the citizen's basis of knowledge.

In *Gates* the Supreme Court held that while basis of knowledge can be an important factor in the totality of the circum-

stances, a "deficiency" in the basis of knowledge can be compensated by a strong showing of veracity or some other indicia of reliability. *Gates,* 462 U.S. at 233, 103 S.Ct. 2317. This court's post-*Gates* decisions do not always discuss, or even mention, the source's basis of knowledge. *See White,* 763 A.2d at 720–722 (no explicit analysis of basis of knowledge when citizen approached officer expressing fear that individuals in a car were out to harm her nephew); *Parker,* 601 A.2d at 49, 53 (no analysis of basis of knowledge when identified informant reported the presence of a bag full of drugs in a nearby car). In any event, the basis of a caller's knowledge can frequently be inferred from the call itself, as was the case in *Groves,* in which "it was apparent that he was personally observing the occurrence he was then describing." *Groves,* 504 A.2d at 605. The same can be said here. The caller said that 646 Newton Place was "my building" and that a man with a gun in his waistband was standing in front of that address. From this, one could reasonably infer that the caller was looking out the window at (or had just seen) that gunman. Moreover, he was able to answer the dispatcher's direct question about who else was outside the building with the gunman at that very moment. From this evidence[19]

---

**16.** The Supreme Court has stated, however, that "reasonable suspicion [justifying a *Terry* stop] can arise from information that is less reliable than that required to show probable cause." *Alabama v. White,* 496 U.S. at 330, 110 S.Ct. 2412. Thus in this case, even assuming that the informant had previously lied to law enforcement officials about a tip and that Officer Hackley knew it, that fact would not necessarily make the officer's stop and frisk unreasonable.

**17.** The audiotape contains the following:
Dispatcher: Sir, didn't you ... call the police about this yesterday?
Caller: No, ma'am.
⁕ ⁕ ⁕ ⁕ ⁕
Dispatcher: Yes, you did.
Caller: No.
Dispatcher: I remember.

Caller: No.
⁕ ⁕ ⁕ ⁕ ⁕
Dispatcher: Sir, we're gonna send the police out there, but you called this same thing in yesterday.
Caller: No, I did not call yesterday.
Dispatcher: You called from another location.
Caller: No, ma'am.
Dispatcher: Okay....

**18.** Moreover, since Officer Hackley had no knowledge of the interaction between the dispatcher and the caller, this information played no part in Officer Hackley's decision to conduct a stop and frisk.

**19.** Other evidence to the same effect included the urgent tone of the call to 911, the fact that the caller spoke quietly to the dispatcher so as

the trial court could permissibly infer, as it did, that the informant was an eyewitness to the reported crime.

### III

Next, appellant contends that the 911 call received by the dispatcher on the day before the arrest, to which the dispatcher referred in the 911 call that was played for the court and admitted into evidence, could have been used to impeach the caller's credibility or to show bias. The court's refusal to let him do so, he maintains, was reversible error.

We are not persuaded that the previous 911 call would have been relevant to any issue before the court at the suppression hearing. Under *Terry v. Ohio*, the standard for determining whether a police officer had a reasonable articulable suspicion is whether "the facts available to the officer *at the moment of the seizure or the search* [would] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]" 392 U.S. at 21–22, 88 S.Ct. 1868 (citations omitted; emphasis added). Officer Hackley had no knowledge of the previous conversation between the dispatcher and the citizen, and thus he had no reason to doubt the information given to him by the dispatcher, which he could reasonably infer came from an eyewitness who saw the man with the gun in his waistband. We see no way in which the previous day's tip could have influenced the officer's decision to conduct a *Terry* stop because he was utterly unaware of that tip. Since the issue to be decided here is the reasonableness of the officer's actions, the contents of the previous day's call, if indeed there was such a call, are essentially irrelevant.[20]

▮▮ Finally, as the government reminds us, the request for discovery of the tape was governed by Super. Ct.Crim. R. 16. Denials of such requests can be overturned on appeal only for abuse of discretion, and only on a showing that the defense was prejudiced. We find neither abuse of discretion nor prejudice. *See, e.g., United States v. Curtis*, 755 A.2d 1011, 1014–1015 (D.C.2000); *Davis v. United States*, 641 A.2d 484, 494 (D.C. 1994); *United States v. Graham*, 317 U.S.App.D.C. 418, 426, 83 F.3d 1466, 1474 (1996). The tape was not subject to disclosure under the Jencks Act because it was not the statement of a witness who testified in court. *See* 18 U.S.C. § 3500(a), (b) (2000).

---

not to be overheard, his insistence on immediate police response ("can you send the police, please?"), and his stated desire for the call to remain confidential.

**20.** In our view, it makes no difference whether, as appellant suggests, the information available to the dispatcher should be imputed to the officer. Even if Officer Hackley had known (which he did not) of the disagreement between the caller and the dispatcher regarding whether, as the dispatcher claimed, the caller had also telephoned in a tip on the previous day, this would not have deprived the officer of articulable suspicion to make the stop. If such information were imputed to Officer Hackley, he *would* have known only that *there* was some question, unresolvable in the limited time available in which to take action, about whether the caller's denial that he had also made another call on the previous day was truthful or not. In our view, the existence of that unresolvable question, standing alone, would not have sufficiently impaired the caller's apparent reliability to preclude a stop.

The caller, as we have noted, had identified himself to the dispatcher by name, address, and telephone number, and the evidence showed that he was exactly where he said he was when he made the call. This was sufficient to make the relatively modest showing required to establish articulable suspicion, and this is true regardless of the disagreement between the caller and the dispatcher regarding a call which may or may not have been made on the previous day.

## IV

There being no basis for reversal, appellant's convictions are all

*Affirmed.*