Beckwith, Associate Judge,
concurring in part and dissenting in part:
I dissent from the majority’s holding that the photograph of Nathan Jackson “from the neighborhood” and the tip that he was in a certain apartment — also “from the neighborhood” — were sufficiently corroborated by Mr. Jackson’s presence in the apartment, his nervousness when confronted and cornered by two police officers in a bedroom, and inaccurate statements by the apartment’s residents about Mr. Jackson’s presence to justify his seizure by the police. In my view, the tip and the photograph — although transmitted through a non-anoriymous intermediary, complainant Corinthea Thompson’s mother — came, for all intents and purposes, from an anonymous source (“the neighborhood”), “whose reputation [could not] be assessed and who [could not] be held responsible if [the] allegations turned out to be fabricated.” Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Further, the equivocal corroborating evidence in this case was insufficient to *1269 demonstrate that the “tip [was] reliable in its assertion of illegality,” as opposed to its mere “tendency to identify a determinate person.” Id. at 272, 120 S.Ct. 1375. I would therefore hold that under the totality of the circumstances, the police lacked “particularized and objectively reasonable ar-ticulable suspicion” that Mr. Jackson was the person who robbed Ms. Thompson an hour earlier, In re Z.B., 131 A.3d 351, 353 (D.C. 2016), and would reverse the judgment of the Superior Court.
I.
Although the majority fairly summarizes the sequence of events leading up to Mr. Jackson’s seizure, as revealed in the suppression-hearing testimony, it may be helpful to restate the facts from the perspective of Officer Stephen Chih. Officer Chih was the officer who seized Mr. Jackson, and only the facts that were known to him matter to the Fourth Amendment analysis.[1]
Around forty-five minutes to an hour after Ms. Thompson was robbed, Officer Chih and Officer Curt Bonney arrived at the intersection of 35th and East Capitol Streets. Ms. Thompson’s mother, Shirley Thompson-Wright, had called the police to report that she had information about Ms. Thompson’s assailant. “[A]t th[e] time” he arrived, Officer Chih “didn’t really know too much ... other than the fact that there was a report of a robbery reported by ... Officer Smith.” Ms. Thompson-Wright told Officer Chih and Officer Bon-ney that her daughter had been robbed, and “that the suspect to her daughter’s robbery was staying up at 2345 East Capitol Street, apartment 301.” “[S]he was yelling and screaming and ... pointing to an apartment,” and she threatened that “[i]f [the police didn’t] go in there, [she was] going [to] go in there and handle whatever [she] got to do.”
Officer Chih “learned in [his] brief conversation” with Ms. Thompson-Wright “that she herself had not actually witnessed the robbery.” Ms. Thompson-Wright produced a photograph, however, which she claimed was a picture of the robber.[2] Officer Chih asked her where the information about the suspect and the photograph came from, and she “indicated that she just got [them] from the neighborhood.” Officer Chih “didn’t know at that time whether the person or people who had given Ms, Thompson[-]Wright that photograph ... had witnessed the robbery.” Officer Chih “was kind of baffled” by what Ms. Thompson-Wright had told him, but he was “focused on trying to look for a suspect.” He called for backup, and when it arrived, he and Officer Bonney entered the apartment complex and proceeded to apartment 301.
*1270 When Officer Chih and Officer Bonney knocked on the door of the apartment, they were greeted by Joyce Lewis, “the legal tenant.” The officers “told her that a serious crime had occurred earlier in the day and that there was information that a potential suspect was in her apartment.” They showed her the photograph and “asked [her] if there were any males that lived or [were] staying inside the apartment with her.” Ms. Lewis responded, “[Y]es, I have my son here,” and, at the officers’ prompting, she called her son, Craig Lewis, to the door. The officers asked to see Mr. Lewis’s identification card, but Mr. Lewis did not have it on his person. As described in the majority opinion, Ms. Lewis eventually let Officer Chih and Officer Bonney into the apartment, and the officers followed Mr. Lewis as he went to his bedroom to retrieve the identification card. Before doing so, the officers asked Joyce and Craig Lewis whether there was “anybody inside the apartment. And they indicated, no, that there was ... nobody else inside the apartment.”
Arriving at the entrance to the bedroom, Officer Chih saw that there were in fact two males other than Mr. Lewis inside, which “p[iqu]ed [his] suspicions”: Mr. Jackson was seated on a bed, and his brother on a sofa. To Officer Chih, they seemed “[v]ery nervous” — they were “[w]ide eyed, kind of breathing a little bit heavy, constantly ... making eye contact with” each other. Officer Chih thought that the two brothers looked “very similar” and that both resembled the person in the photograph. Officer Chih instructed Mr. Jackson and his brother “not to move” and soon after told Mr. Jackson to “stand up.” The sequence of events that followed, described in the majority opinion, resulted in the officers finding ammunition and a weapon and in Mr. Jackson being identified in a show-up procedure.
II.
In telling Mr. Jackson “not to move” and to “stand up,” Officer Chih effected an investigatory stop, a seizure under the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We should hold that this seizure was unlawful because Officer Chih lacked a reasonable suspicion that Mr. Jackson was responsible for Ms. Thompson’s robbery. Z.B., 131 A.3d at 353. Officer Chih did not know the source of the photograph or tip — except that they came “from the neighborhood” — and had no way to assess the tip’s reliability. And the tip was completely conclusory. The Lewises’ possible dishonesty and the nervousness of Mr. Jackson and his brother in the presence of the officers — factors that our court and others have recognized as relatively weak — were insufficient to remedy these deficiencies.
A.
Although “information from an identified citizen is presumptively rehable,” Joseph v. United States, 926 A.2d 1156, 1161 (D.C. 2007), “courts are properly wary of sustaining seizures on the basis of anonymous tips, and require a substantial measure of corroboration of information anonymously provided,” Brown v. United States, 590 A.2d 1008, 1015 (D.C. 1991). See also Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (“[A]n anonymous tip alone seldom demonstrates the informant’s basis of knowledge or veracity .... ”). Where the identity — and thus the motive, credibility, and basis of knowledge — of an informant are unknown, it is “possible that the [informant’s purported knowledge [i]s second-hand or third-hand or supposition or rumor or the product of a grudge against a rival or vengeance against an enemy.” Brown, 590 A.2d at *1271 1017. Further, a known informant can “be held accountable” — criminally[3]—“for [his or her] false report.” Joseph, 926 A.2d at 1161. An anonymous informant, by contrast, may believe anonymity will.enable him or her to evade the consequences of a false report and thus be less apprehensive about lying. See id.; see also Brown, 590 A.2d at 1016 (“[A] citizen who prefers to remain anonymous would seem less reliable than a citizen willing to accept personal responsibility for his accusations.” (quoting Rushing v. United States, 381 A.2d 252, 255 (D.C. 1977)) (alteration in original)).
“[A]nonymity takes on even greater significance where there has not even been a face-to-face confrontation between the person giving the information and the police.” Brown, 590 A.2d at 1016 (quoting 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.4 (a) (2d ed. 1987)) (alteration in original). When an officer speaks to an anonymous informant in person, the officer has an “opportunity to observe the [informant’s demeanor — ‘mannerisms, expressions, and tone of voice’ — and thus evaluate the [informant’s credibility and veracity.” In re S.B., 44 A.3d 948, 953 (D.C. 2012) (quoting United States v. Romain, 393 F.3d 63, 73 (1st Cir. 2004)) (footnote omitted). An officer cannot assess the reliability of a remote anonymous informant in this manner. Moreover, the risk of “an in-person informant ... losing anonymity” is higher than that of a remote informant, furnishing more of an incentive for an in-person informant to be honest. Id. at 953.
The information Ms. Thompson-Wright gave to Officer Chih was, if not technically an anonymous tip, functionally equivalent to one.[4] The factors that render anonymous tips presumptively unreliable are plainly present here. Notwithstanding that Ms. Thompson-Wright was probably motivated by a desire to help bring her daughter’s assailant to justice, the motive of the source or sources of the information and *1272 photograph was completely unknown to Officer Chih. See United States v. Monteiro, 447 F.3d 39, 46 (1st Cir. 2006) (holding that a tip from an unnamed relative of a non-anonymous witness, relayed by the witness, was unreliable because, inter alia, “even if [the witness] was honest in his interactions with the police,, his unnamed relative may have had her own motive for fabricating incriminating evidence”). For all Officer Chih knew, the source or sources were motivated by a grudge or a desire to “harass .,. [by] set[ting] in motion an intrusive, embarrassing police search.” J.L., 529 U.S. at 272, 120 S.Ct. 1375; Brown, 590 A.2d at 1017. Similarly, Officer Chih knew nothing about the credibility of the sources or the basis of their knowledge. The tip could have been based on nothing more than “casual rumor or ... [Mr. Jackson]’s general reputation.” Mitchell v. United States, 368 A.2d 514, 516 (D.C. 1977). All that Officer Chih knew was that Ms. Thompson-Wright had no firsthand knowledge of the robbery.
Not only were the sources of the tip identifying Mr. Jackson unknown to Officer Chih, thus making it unlikely that they could be identified and held accountable if the tip turned out to be false, but they also did not even communicate with the police, thus making it unlikely that, even if they were later identified, they could be held liable for a false statement.[5] Moreover, because Officer Chih did not interact with the source or sources of the tip in person, he could not assess their demeanor, and he of course could not rely on a history of past dealings with the sources or their reputation for honesty and reliability. This court previously remarked that “an anonymous telephone tip is of the ‘weakest reliability.’ ” Brown, 590 A.2d at 1016 (quoting People v. Crea, 126 A.D.2d 556, 559-60, 510 N.Y.S.2d 876, 880 (2d Dept. 1987)). A tip “from the neighborhood” would appear even less reliable.
B.
Because the information and photograph relayed by Ms. Thompson-Wright to the police amounted to what was essentially an anonymous tip, they, “standing alone, would not ‘warrant a [person] of reasonable caution in the belief that [the seizure of Mr. Jackson] was appropriate.’ ” White, 496 U.S. at 329, 110 S.Ct. 2412 (quoting Terry, 392 U.S. at 22, 88 S.Ct. 1868) (internal quotation marks omitted). There are, however, “situations in which an anonymous tip, suitably corroborated, exhibits ‘sufficient indicia of reliability to provide reasonable suspicion.’” J.L., 529 U.S. at 270, 120 S.Ct. 1375 (quoting White, 496 U.S. at 327, 110 S.Ct. 2412). Such corroboration must show that the tip is “reliable in its assertion of illegality, not just in its tendency to identify a determinate person.” Id. at 272, 120 S.Ct. 1375. In the present case, the corroboration was too scant to provide sufficient corroboration.
First, it is not true that “the photograph and address [Ms. Thompson-Wright] pro *1273 vided indicate ‘a special familiarity with [Mr. Jackson’s] affairs.’” Ante at 1266 (quoting White, 496 U.S. at 332, 110 S.Ct. 2412). All that the photograph and knowledge of the address show are that after hearing from some source — whose reliability was completely unknown to Officer Chih — that it was Mr. Jackson who committed the robbery, Ms. Thompson-Wright was able to find someone in the neighborhood who had a photograph of him and who knew where he could be found. Indeed, as the explanation of how Ms. Thompson-Wright came to acquire Mr. Jackson’s photograph and address shows, once Ms. Thompson-Wright came to suspect that a friend of “Chucky” was the robber, she had little trouble obtaining the photograph and address. See ante at 1262 n.2. In other words, if instead of being told by Ms. Thompson (the complainant) that the “assailant was the ‘boy from around the neighborhood that always drove the red car and that always hung out with ... Chucky,’” ante at 1262 n.2, Ms. Thompson-Wright had simply heard a rumor to that effect, all of the other steps in the process that led to her obtaining the photograph and address could have been the same.
Not only do the photograph and information about where Mr. Jackson could be found fail to indicate that Ms. Thompson-Wright had a special familiarity with his affairs, but they do not even indicate that Ms. Thompson-Wright’s source or sources had a special familiarity with Mr. Jackson’s affairs. It is hardly uncommon for a person’s family members and friends to have photographs of the person and to know where he or she stays, while knowing little of — or at least lacking “special familiarity” with — the person’s criminal activities. If there is any correlation between possession of a person’s photograph or knowledge of the person’s address and special knowledge of the person’s criminal activities, it is likely a weak one, insufficient to create reasonable suspicion. See White, 496 U.S. at 332, 110 S.Ct. 2412 (holding that an anonymous informant’s “ability to predict respondent’s future behavior” — namely, the route that respondent would take to deliver a package of cocaine — “demonstrated insidé information[,] a special familiarity with respóndent’s affairs,” and thus rendered the informant’s tip sufficiently reliable — although it was a “close case”); see also Navarette v. California, — U.S. -, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (finding an anonymous tip sufficiently reliable because, inter alia, there were reasons to believe that the informant actually witnessed the criminal activity reported, and because the informant used the 911 emergency system — thus makng it possible to identify him or her later).
Second, the information that Officer Chih learned when he entered apartment 301 did little to corroborate the conclusory tip “from the neighborhood.” That Mr. Jackson was inside the apartment, consistent with the tip, does not demonstrate that the “tip [was] reliable in its assertion of illegality” but merely that it was reliable in “its tendency to identify a determinate person.” J.L., 529 U.S. at 272, 120 S.Ct. 1375 (holding that an anonymous tip that described a suspect’s appearance and location and alleged that he was carrying a concealed weapon was insufficiently corroborated by the officer’s observation of the appellant, who matched the description, “hanging out” at the indicated location).[6]
*1274 Similarly, the Lewises’ inaccurate statements about the presence of Mr. Jackson and his brother in the apartment are insufficient to make up for the fact that the reliability of the anonymous tip was almost completely unknown and unverifíable. True, while one or both of the Lewises may simply have been honestly mistaken, a reasonable officer in Officer Chih’s position could have concluded that they had lied.[7] But a reasonable officer could not infer from this information that the Lew-ises were aware of Mr. Jackson’s participation in a robbery. After all, Officer Chih showed the Lewises a photograph that looked like Mr. Jackson (and also like his brother) and told them a “serious crime” had been committed and that the suspect was possibly in the apartment — indicating that Mr. Jackson and his brother were suspects. If the Lewises were willing to lie to protect Mr. Jackson and his brother from arrest, Officer Chih’s actions presumably would have been sufficient to trigger this protective behavior, independent of the Lewises’ knowledge of Mr. Jackson’s actual criminal activities. Moreover, as this court has noted before, while a lie can “reflect consciousness of guilt” (or consciousness of a friend’s guilt), it can “also reflect merely that the person ... is afraid of the police” (or that he or she fears what the police will do to his or her friend). Gordon v. United States, 120 A.3d 73, 84 (D.C. 2015). Mere dishonesty by a suspect or his or her acquaintance cannot make up for a lack of “concrete evidence” that the suspect was involved in “criminal activity.” Id.; see also United States v. Wilson, 953 F.2d 116, 125 (4th Cir. 1991) (“Without stronger articulable grounds of ongoing criminal behavior, [the defendant’s] falsehood is simply not sufficient cause for ... a seizure .... ”).
Mr. Jackson’s and his brother’s nervousness when two police officers confronted them in the bedroom adds little. A suspect’s nervousness is a relevant factor in the reasonable-suspicion analysis, but it is *1275 “not particularly probative because most citizens with nothing to hide will nonetheless manifest an understandable nervousness in the presence of [an] officer.” Wade v. State, 422 S.W.3d 661, 670-71 (Tex. Crim. App. 2013) (internal quotation marks and citation omitted); see State v. Moore, 415 S.C. 245, 781 S.E.2d 897, 902 (2016) (criticizing “law enforcement’s reliance on the seemingly omnipresent factor of nervousness”), cert. denied, — U.S. -, 136 S.Ct. 2473, 195 L.Ed.2d 809 (2016). In Anderson v. United States, 658 A.2d 1036 (D.C. 1995), for example, this court held that the defendant’s “wide-eyed” nervousness, evasive act of “quickly walkpng] away from the police,” dishonest response to police questioning, and presence in a “high crime area,” along with other factors, were insufficient to furnish reasonable suspicion that the defendant was engaged in criminal activity. Id. at 1038; see also Gordon, 120 A.3d at 83-84. Here, there was likewise no concrete evidence that Mr. Jackson had engaged in the robbery earlier — there was only a general tip, without any supporting details, “from the neighborhood.” As in Anderson, the evidence of nervousness and dishonesty was insufficient to create reasonable suspicion.
III.
The central problem with the majority’s analysis is that it fails to recognize just how weak the anonymous tip in this case was. The tip was completely lacking in detail, it came “from the neighborhood,” and there was no indication that it was based on eyewitness knowledge or inside information — or indeed, that it was based on anything other than rumor. The majority fails to articulate — and I am unable to understand — how Ms. Thompson-Wright’s possession of a photograph of Mr. Jackson shows that her source or sources had “inside information” or “special familiarity” with the crime. Moreover, the only part of the tip that “panned out,” ante at 1267, was that part that identified where Mr. Jackson could be found, and given the conclusory nature of the tip, this was probably the only part of the tip that could have been expected to pan out — barring the possibility that Mr. Jackson would be found with the fruits of the robbery or would immediately confess in the officers’ presence. Given these serious deficiencies, I am unwilling to say that the Lewises’ possible dishonesty and Mr. Jackson’s and his brother’s nervousness — factors whose significance this court and other courts have rightly minimized — were sufficient to justify the intrusions in this ease.[8] I respectfully dissent.

. The majority does not rely on the "collective knowledge doctrine," which under certain circumstances allows the government to demonstrate probable cause or reasonable suspicion by "aggregat[ing] the knowledge” of multiple police officers. McFerguson v. United States, 770 A.2d 66, 72 (D.C. 2001). This doctrine generally applies only where one officer has communicated information to another or where, despite the lack of communication, the officers are at least engaging in a joint investigation in roughly the same location at the same time. See Milline v. United States, 856 A.2d 616, 620 (D.C. 2004); McFerguson, 770 A.2d at 72. Here, although other officers had been present on the scene some time before Officer Chih, and they had taken a description of the robber from Ms. Thompson, Officer Chih denied in his suppression-hearing testimony that he had been provided with this description. The collective knowledge doctrine thus would not be applicable.

. The photograph had disappeared by the time of suppression hearing, and the trial court was thus unable to review it. Officer Chih described the photograph for the trial court.

. See D.C. Code § 5-117.05 (2012 Repl.) ("[Wlhoever shall ... communicate or cause to be communicated to [the] Metropolitan Police force, or any officer or member thereof, any false information concerning the commission of any criminal offense ..., knowing such information to be false, shall be punished by a fine ... or by imprisonment .... ”).

. The majority contends that because Ms. Thompson-Wright was not an anonymous informant, "rigorous scrutiny of the basis of [her] knowledge [was] unnecessary.” Ante at 1266 (quoting Joseph, 926 A.2d at 1161) (emphasis omitted) (alterations in original). It is questionable whether, if generalized, this is an accurate statement of the law — the majority relies on a truncated quotation from Joseph that leaves out two important qualifiers. See Joseph, 926 A.2d at 1161 ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity — which if fabricated would subject him to criminal liability — we have found rigorous scrutiny of the basis of his knowledge unnecessaiy.” (quoting Illinois v. Gates, 462 U.S. 213, 233-34, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (emphasis added)). But even if the majority’s statement of the law were accurate, it would not justify this court in ignoring facts known to Officer Chih that cast doubt on the reliability of Ms. Thompson-Wright's information. The problem is not so much that Officer Chih failed to adequately scrutinize the basis of Ms. Thompson-Wright's knowledge, but rather that he failed to give sufficient weight to her own admission that the basis of her knowledge was either neighborhood rumor or conjecture or an anonymous source whose credibility and reliability were unknown. This court has never held that it should ignore facts that tend to undermine reasonable suspicion. See Pridgen v. United States, 134 A.3d 297, 301 (D.C. 2016) ("To determine whether police officers had reasonable suspicion, a court must review the totality of the circumstances present.” (emphasis added)); cf. Ramsey v. United States, 73 A.3d 138, 147 (D.C. 2013) (holding that a seizure was unlawful because certain facts had “dispelled” the officer’s reasonable suspicion).

. D.C. Code § 5-117.Ó5 makes it a crime for a person to “cause to be communicated” to the police a knowingly false statement. Thus, if the anonymous source "from the neighborhood” knew or intended that Ms. Thompson-Wright would convey false information to the police, he or she could be prosecuted, Under those circumstances, however, it would likely be a challenge for the government to secure a conviction. It is beside the point, moreover, that Ms. Thompson-Wright "could be held ‘accountable’ for the information [s]he gave,” Ante at 1266 (quoting Joseph, 926 A.2d at 1160) (alteration in original). The concern is that the source or sources "from the neighborhood” were unreliable — not that Ms. Thompson-Wright was. And in any case, unknowingly relaying false information to the police — even negligently — would not subject Ms. Thompson-Wright to criminal liability. See D.C. Code § 5-117.05.

. Recently, in Jenkins v. United States, 152 A.3d 585 (D.C. 2017), this court held that a suspect description generated by officers who had reviewed a surveillance video and con *1274 veyed to another officer who had not seen the video was insufficient to provide the latter officer with reasonable suspicion to stop the appellant. Two of the court's reasons for reversing are pertinent here.
First, the court explained that "to support a finding of reasonable suspicion based on information passed from one police officer to another, the government must apprise the judge 'of sufficient facts to enable him to evaluate the nature and reliability of that information.' " Jenkins, 152 A.3d at 590 (quoting In re T.L.L., 729 A.2d 334, 341 (D.C. 1999)). The government’s failure to have any of the officers who had actually watched the surveillance video testify at the suppression hearing made it impossible for the trial court to determine the reliability of their description. Similarly, although the court in the present case was apprised of the basis of Ms. Thompson-Wright’s tip at the suppression hearing, no officer had been aware of this information at the time that Mr, Jackson was seized. Thus, neither Officer Chih nor any other officers was able to assess the reliability of Ms. Thompson-Wright’s tip.
Second, in Jenkins, there was "no record evidence that would support the conclusion that the video ... watched [by the officers] had something to do with the attempted robbery — meaning that even if appellant resembled someone in the video, this would not implicate him in the attempted robbery.” 152 A.3d at 591. Analogously, in the present case, Ms. Thompson-Wright did not provide any information to the officers about the source of her tip and the photograph. Thus, the officers lacked the information that they would have needed to reasonably suspect that the individual pictured in the photograph was indeed the person who committed the robbery of Ms. Thompson.

. A conclusion that the Lewises deliberately lied is in some tension with Officer Chih's testimony that the Lewises voluntarily allowed him and Officer Bonney to enter the apartment and follow Mr. Lewis back to his bedroom, making discovery of Mr. Jackson and his brother (and thus the purported lies) inevitable.

. It is worth noting that although the volun-tariness of the Lewises’ consent to the officers’ entry into their apartment is not at issue te this appeal, the officers in this case relied on Ms. Thompson-Wright’s barebones and un-sourced tip to gain entry.